[Cite as *Miller v. State*, 2014-Ohio-3738.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Dennis D. Miller, Individually and as Administrator of the Estate of Pauline J. Miller, deceased, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-849 (Ct. of Cl. No. 2009-07679) |
| State of Ohio, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| The Ohio Department of Transportation, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 28, 2014

*Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Jamie R. Lebovitz, Ellen M. McCarthy* and *Kathleen J. St. John*, for appellee Dennis D. Miller.

*Michael DeWine*, Attorney General, *William C. Becker* and *Emily M. Simmons*, for appellant.

APPEAL from the Court of Claims of Ohio

O'GRADY, J.

{¶ 1} Defendant-appellant, Ohio Department of Transportation ("ODOT"), appeals from the judgment of the Court of Claims of Ohio in favor of plaintiff-appellee, Dennis D. Miller ("appellee"), individually and as administrator of the estate of Pauline J. Miller ("Miller"). For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This case involves what can be described as either a large pothole or series of potholes on State Route ("S.R.") 165. Appellee filed a complaint against the state of

Ohio and ODOT alleging on March 11, 2008,[1] his wife, Miller, was traveling northbound on S.R. 165 in Columbiana County, Ohio. At the same time, Joseph Goscenski, Jr., was operating a truck in the southbound lane and hit one or more potholes which caused him to lose control of his truck, cross the centerline, and strike Miller's vehicle, resulting in her death. Appellee claimed the state, through ODOT, negligently failed to repair the potholes and alleged a claim for Miller's wrongful death.[2] The Court of Claims bifurcated the issues of liability and damages for trial and ordered the matter be tried with a separate action filed against the state by Goscenski and others.[3] A summary of the pertinent testimony from the trials follows.

{¶ 3} During the liability trial, Goscenski testified he had over 30 years experience driving trucks. On March 9 and 10, he worked 12.5 and 11.5 hours respectively and began work around 3:00 a.m. On March 11, he started work at 1:00 a.m. Goscenski testified his work schedule complied with federal law. Although Goscenski typically drove a tractor-trailer, on March 11 he drove a straight truck; however, he had driven a straight truck before. Goscenski testified a straight truck is easier to drive than a tractor-trailer because it has a less complicated gear shift. He did a pre-trip inspection of the truck, including the tires, which had no observable defects. The truck had one tire on each side of the front end and two tires, i.e., "duals," on each side of the rear end. (Dec. 6, 2010 Tr. 82.) Two weeks before the accident, the truck got brand new front tires.

{¶ 4} On March 11, Goscenski made a delivery in Cleveland and departed between 4:30 and 4:45 a.m. for Pittsburgh. He testified that around 6:45 a.m., he was 3.5 miles from the Pennsylvania border, traveling southbound on S.R. 165 in a 55 m.p.h. zone. He ascended a hill at 45 to 50 m.p.h., and as he crested the hill at 50 m.p.h. he could not see any potholes ahead. Within seconds, he heard a big bang and the truck went left of

---

[1] Unless otherwise stated, all dates in this decision will refer to 2008.

[2] Appellee also alleged a survival claim for conscious pain and suffering Miller experienced before her death but effectively abandoned this claim by not requesting such damages during or after the damages trial and presenting no evidence of such damages.

[3] In the separate action, the Court of Claims granted ODOT judgment on the pleadings with regard to an indemnification claim. Thus, the liability trial for purposes of that action focused on a claim of ODOT's negligence. After the liability trial but before the damages trial, the parties entered into a settlement agreement which resulted in a dismissal of the negligence claim. We recently issued a decision in an appeal from the judgment on the pleadings in *Goscenski v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-585, 2014-Ohio-3426.

center.  Goscenski thought he blew a tire.  He hit the brakes, unsuccessfully tried to steer the truck back to the right, and then braced himself for impact with Miller's vehicle.  After the accident, Goscenski learned he did not blow a tire and was certain he struck the potholes on S.R. 165, which caused him to lose control of the truck.  On cross-examination, Goscenski testified he held onto the steering wheel after he struck the potholes.  When confronted with his deposition to the contrary, Goscenski testified the wheel may have been torn from his hands but he could not remember.  At trial, Goscenski also could not recall if he honked his horn before impact.  However, at his deposition, he testified to honking it.

{¶ 5}  The day of the accident, Goscenski had a doctor's appointment at 8:30 a.m.  This factored into his choice to take S.R. 165, a faster route he had not used in approximately six months.  Goscenski admitted he was in a hurry "to a point" because he wanted to get to the appointment.  (Dec. 6, 2010 Tr. 93.)  However, if the accident had not occurred at 6:45 a.m., he would have returned the truck at 7:30 a.m. and had plenty of time to travel ten more miles to the doctor's office without driving carelessly.  In his written statement to the Ohio State Highway Patrol ("OSHP"), Goscenski said the accident happened at 7:18 a.m.

{¶ 6}  Retired Trooper Timothy Jones ("Trooper Jones"), a former crash investigator and reconstructionist with OSHP, investigated the accident while on active duty.  He took measurements, spoke to Goscenski, and helped author an accident report.  OSHP's scale diagram of the scene depicts two potholes on the right-hand side of the southbound lane of S.R. 165.  The first pothole is 17.79 feet long, and the second is 10.67 feet long.  The OSHP report notes:  "Pavement in poor condition due to large pot holes at the scene.  Large pot hole measured and found to be 5 inches in depth with a width of 24 inches into the southbound lane.  The south end was not gradual but abrupt and near straight down."  (Joint exhibit No. 1.)  Trooper Jones explained hitting the south end of this pothole would be "basically like hitting a curb."  (Dec. 6, 2010 Tr. 126.)

{¶ 7}  No one from OSHP reconstructed the accident, but Trooper Jones did not feel that was necessary.  Trooper Jones believed Goscenski hit a pothole and was not speeding.  On the OSHP report, Trooper Jones listed Goscenski's failure to control as a contributing factor to the accident.  However, Trooper Jones admitted his investigation

did not reveal any possible cause for the accident aside from Goscenski striking the pothole. Goscenski tested negative for alcohol use.

{¶ 8} John Rieseck, a friend of the Millers' son, testified that he used to live on S.R. 165 and saw the ambulance and both disabled vehicles the morning of the accident. Rieseck testified he struck potholes at the scene about two or three weeks earlier, causing his steering wheel to jerk hard and his vehicle to go left of center. The potholes were in the southbound lane, after the crest of a hill, and visible for "a split second or two before you actually hit them." (Rieseck Depo. 34.) He reported the potholes to ODOT soon after he struck them but could not recall exactly when or if he spoke to a man or woman. Rieseck observed other cars hit the potholes and "kick" to the left. (Rieseck Depo. 37.) Rieseck testified that between his incident with the potholes and the accident, the potholes grew in size.

{¶ 9} Although appellee did not produce any evidence ODOT or OSHP received calls about S.R. 165 in the weeks before the accident, Becky Giauque, an employee at ODOT's District 11 office, which encompasses Columbiana County, testified ODOT has no set policy for logging roadway complaints from the public. When asked if it was likely a complaint to District 11 about a pothole would go unrecorded, Giauque testified she could not say, and it depended on who took the complaint. But at her deposition, Giauque testified it was quite likely complaints went unrecorded. Sandra Rafferty, an OSHP dispatcher, testified OSHP does not require dispatchers to document road hazard complaints, and in her experience not all calls get recorded.

{¶ 10} Harold Lipp testified he has lived at the corner of S.R. 165 and Heck Road since 1954. He did not know Miller or her family. About three to four weeks before the accident, he saw potholes in the southbound lane of S.R. 165. The potholes deteriorated over time, and Lipp drove down the center of the road to avoid them. The Sunday before the accident, i.e., March 9, Lipp drove to church and saw a lot of snow on S.R. 165. By the time he drove home, S.R. 165 had been plowed. He surmised the state plowed that day because ODOT trucks were the only ones he ever observed plow S.R. 165. Lipp thought the plow hit the potholes because he saw a "perfect imprint" of a plow blade in the snow bank next to them. (June 2, 2011 Tr. Vol. II, 198.) Lipp did not report the potholes believing they would be repaired now that an ODOT plow struck them. Lipp testified a

photograph of the potholes taken after the accident fairly and accurately depicted their condition on March 9.  On March 11, Lipp observed the accident scene from his property.

{¶ 11} Joseph Filippino, a civil engineer, reviewed photographs of the potholes and opined portions of the potholes had been patched before.  He also opined that the potholes took longer than 24 hours to develop and began as many as 5 weeks before the accident.

{¶ 12} Barry Miner testified he was ODOT's county manager for Columbiana County in 2008.  His duties included inspecting county roadways, which he typically did 3 to 4 hours per day, to make decisions about when to schedule work crews and how to prioritize projects.  Miner inspected S.R. 165 on March 6 and saw "first layer" potholes approximately 2 inches deep, 12 inches long, and 8 inches wide.  (June 1, 2011 Tr. Vol. I, 139.)  Miner thought the potholes did not require immediate repair but still intended to have them fixed.  However, he did not document the number, location, or size of the potholes or have them patched prior to the accident.  Miner admitted ODOT had designated S.R. 165 as a poor performing road.

{¶ 13} According to Miner, ODOT is responsible for 650 miles of roadway in Columbiana County, and the section of S.R. 165 at issue contains about 3 of those miles.  Records indicate ODOT engaged in pothole patching in Columbiana County on March 6 and 7.  Miner testified on March 7, his workforce also engaged in snow and ice control anticipating 8 inches of snow that evening.  The county received more than 8 inches, so the workforce engaged in additional snow and ice control on March 8 and 9.  Miner testified his workforce could not patch potholes when they were in snow and ice control mode.  On March 10, crews engaged in snow and ice control along with pothole patching.  Miner testified "[b]ased upon allocated man hours if I have an eight-inch snowstorm, which we had, * * * snow and ice for that weekend would have taken precedence [over repairing pavement defects]."  (June 1, 2011 Tr. Vol. I, 146.)

{¶ 14} David Ray, a civil engineer and ODOT's state maintenance engineer, examined ODOT's operations in Columbiana County in the days before the accident.  He observed in the 7 days before the accident, ODOT engaged in snow and ice operations and pothole patching all over the county.  Patching occurred at 20 different routes, and 14 of

the routes had higher traffic than S.R. 165, leading Ray to believe crews were patching roads with more traffic during that time frame.

{¶ 15} Henry Lipian, a crash reconstructionist, opined that the front right tire of Goscenski's truck contacted the potholes. The potholes were in the traveled part of the roadway, so there was a high probability a commercial vehicle with a wider wheel track would contact them. The potholes were asymmetrical, and the end of one pothole was deep with an edge like a vertical cliff face. If a tire hit the end of this pothole, it would cause a hard jerk to the right side of the vehicle and a force would transmit through the steering wheel. According to Lipian, photographs of the accident scene depicted a commercial tire imprint in one of the potholes. Lipian inspected the truck in October 2010 and testified the imprint in the pothole was very consistent with the tread design of the truck's front right tire. Also, the tire had unusual distress marks which indicated a strong, isolated, concentrated force had been applied to it, consistent with it striking an abrupt, sharp edge.

{¶ 16} Lipian opined the truck went left of center at an angle and contacted Miller's vehicle at an angle; the truck did not drift left of center. The collision damage and final resting place of the vehicles supported this conclusion. In Lipian's opinion, the potholes, given their depth and shape, were capable of causing Goscenski to lose control of his truck at his stated speed of 50 m.p.h. A driver would likely lose control above 42.56 m.p.h. Lipian also opined that, in light of the hill and other conditions, Goscenski did not have enough time to perceive and react to the potholes to avoid hitting them.

{¶ 17} In addition, Lipian opined that, based on his experience, both vehicles were traveling at or about the speed limit. However, there were too many unknown variables to calculate speed with reasonable accuracy. To determine pre-impact speed, one must know the post-impact speed. However, Lipian could not determine if Goscenski braked after impact. Additional factors complicating a speed calculation were the fact that during impact, the front of the truck was off the ground and on top of the car for a period of time, and post-impact one of the truck's tires may have come off the ground due to uneven terrain. Also, the complex topography of the land over which the truck traveled made it difficult to calculate speed. Lipian testified the truck striking the potholes before impact would not have led to yaw marks on the roadway or caused the truck to roll over.

{¶ 18} Timothy Tuttle, ODOT's accident reconstructionist, opined Goscenski never struck the potholes and this case was a "classic head-on collision," with an impact that occurred entirely within the northbound lane of S.R. 165. (June 3, 2011 Tr. Vol. III, 639.) Tuttle testified if the impact occurred at an angle, damage to the front of the truck would have been in a wedge or angle shape, but it was not. He testified that if the truck struck the pothole and went left of center, there should have been yaw marks on the road, and even going 50 m.p.h., the truck should have rolled over. Tuttle also testified that the tire imprint in the potholes was completely different from the tires on the truck. Tuttle calculated Goscenski's pre-impact speed to be 64 m.p.h.

{¶ 19} After the liability trial, the magistrate recommended the Court of Claims enter judgment in favor of appellee on the issue of liability. The magistrate found Goscenski's testimony that he lost control of his truck because he struck the potholes credible and found the testimony of Lipian more persuasive than that of Tuttle. The magistrate found ODOT had actual notice of the potholes on S.R. 165 on March 6, but the potholes were not of the same magnitude as the potholes that existed on March 11. However, the magistrate found the potholes that existed on March 6 deteriorated and by March 9, ODOT had constructive notice they had become unreasonably dangerous to the traveling public and required immediate repair. ODOT breached its duty to Miller and the traveling public to maintain highways in a reasonably safe condition by not repairing the potholes before March 11. The magistrate found ODOT's failure to repair the potholes was the sole proximate cause of the injuries in this case and rejected ODOT's request for apportionment of fault between it and Goscenski under R.C. 2307.22.

{¶ 20} The Court of Claims adopted the magistrate's decision on the last day the parties had to file objections. Then, ODOT timely filed objections to the magistrate's findings, operating as an automatic stay of execution of the judgment until the Court of Claims disposed of the objections. Civ.R. 53(D)(4)(e)(i). In its objections, ODOT argued it was entitled to immunity,[4] it did not breach a duty because it lacked actual or constructive notice of the potholes, the potholes did not proximately cause the accident, and if the potholes did contribute to the accident, some liability should be apportioned to

---

[4] ODOT raised the issue of immunity in its amended answer but not in its post-trial briefs, which is presumably why the magistrate did not address it.

Goscenski.   Appellee also filed objections to certain aspects of the magistrate's findings. The Court of Claims overruled the objections and adhered to the judgment it previously rendered adopting the magistrate's decision.

{¶ 21} During the damages trial, appellee testified Miller was in extremely good health at the time of her death.  She worked full-time as a clinical nurse specialist at a hospital and part-time as a teacher.  Appellee believed Miller would work until she physically could not because she loved what she did and retirement "was not in her vocabulary." (Jan. 23, 2013 Tr. 46.)  Appellee thought Miller would work until at least age 70.  Miller enjoyed educating and interacting with people.  Her work was not a burden to her.  In addition, Mary Ann Turjanica, one of Miller's co-workers, testified she worked with Miller as a clinical nurse specialist for about four years.  Nursing was Miller's life; she was a "nurse at heart" and loved teaching.  (Jan. 23, 2013 Tr. 92.)  When asked if it would be fair to say Miller had a life-long goal of educating in the nursing field, Turjanica responded in the affirmative and stated, "I think she would have gone as long as she possibly could."  (Jan. 23, 2013 Tr. 97.)

{¶ 22} Economist John Burke, Ph.D., testified regarding Miller's expected earning capacity and the value of her household services.  Dr. Burke explained four factors determine expected earning capacity:  (1) how long the person works before retirement, (2) the person's wages, including fringe benefits, (3) future wages and fringe benefits, and (4) the interest rate, which is used to determine the present value of future earnings, i.e., the amount of money needed today to replace future earnings.  Miller was 48.9 years old at the time of her death, and her statistical life expectancy was 82.7 years old.  Dr. Burke testified the United States Department of Labor ("DOL") compiles statistics on work-life expectancy which indicates a female Miller's age would work until age 59.3.  However, Dr. Burke computed Miller's earning capacity using three other retirement ages:  66 years and 10 months (Social Security retirement age), 70 years, and 75 years.  To calculate what Miller would have earned from 2009 to 2012, Dr. Burke utilized the Employment Cost Index ("ECI") produced by the DOL.  He also testified to his methodology for forecasting Miller's income after 2012 and the interest rates he used.

{¶ 23} Regarding lost services, Dr. Burke testified the American Time Use Study produced by the DOL provides the time an average person performs household services

depending on sex, number of children in the home, and outside employment status. According to the study, a female employed outside the home with no children at home on average performs 2.55 hours of household work each day. After retirement, the same female on average performs 3.74 hours of household work each day. Using these figures, Dr. Burke presented calculations of three possible scenarios for replacing Miller's services until the end of appellee's statistical life expectancy (which was shorter than Miller's statistical life expectancy). First, he calculated the cost of paying someone minimum wage to perform this work. Second, he calculated the cost of paying someone $15 per hour for this work. Third, he calculated the cost of having a live-in housekeeper.

{¶ 24} After the damages trial, the Court of Claims rendered judgment in favor of appellee for $3,343,025. This figure included damages for loss of support and services. The court acknowledged Miller's statistical work-life expectancy of 59.3 years. However, the court was convinced she would have continued to work at both of her jobs until age 66 years and 10 months, Social Security retirement age. The court found the greater weight of evidence demonstrated she was a dedicated employee with no intention of leaving the workforce at age 59.3. The court found the testimony of appellee and Turjanica to this effect persuasive. The court found it unlikely Miller would work through age 70 or 75 given her demanding work schedule. The court also found Dr. Burke reliably testified about his methodology to determine expected earning capacity and awarded $1,300,000 for loss of support based on his calculations. Regarding loss of services, the court awarded $243,000 based on Dr. Burke's calculations for a minimum wage cost of replacement.

{¶ 25} After the Columbiana County Probate Court adjusted the shares of Miller's beneficiaries, the Court of Claims deducted collateral benefits received by each beneficiary from his or her share of the award. Following the deduction for collateral sources, the Court of Claims reduced the total judgment to $1,820,942.04.

## II. ASSIGNMENTS OF ERROR

{¶ 26} ODOT appeals and presents five assignments of error for our review:

> [I.] ODOT'S DECISION THAT A POTHOLE DOES NOT NEED TO BE REPAIRED IMMEDIATELY WHEN PERFORMING SNOW AND ICE REMOVAL FOLLOWING A WINTER STORM IS ONE THAT ENTITLES IT TO DISCRETIONARY IMMUNITY.

[II.] ODOT DID NOT BREACH ANY DUTY OWED TO PLAINTIFF-APPELLEE INASMUCH AS ODOT HAD NO ACTUAL OR CONSTRUCTIVE NOTICE OF THE POTHOLE IN QUESTION.

[III.] THIS ACCIDENT WAS UNFORESEEABLE.

[IV.] THE TRIAL COURT ERRED IN HOLDING THAT THE POTHOLE IN QUESTION PROXIMATELY CAUSED THIS ACCIDENT AND FAILING TO APPORTION THE LIABILITY OF THE TRUCK DRIVER WHO WAS SPEEDING, IN A HURRY, LOST CONTROL, AND WENT LEFT-OF-CENTER CAUSING THE ACCIDENT IN THIS CASE.

[V.] THERE WAS NO ECONOMIC CERTAINTY TO PLAINTIFF-APPELLEE'S ALLEGED ECONOMIC DAMAGES WHICH WERE BASED ON ECONOMIC FIGURES THAT VARIED AS WILDLY AS $1 MILLION DOLLARS, PROJECTED LOST WAGES BEYOND WORK LIFE EXPECTANCY, AND INCLUDED WAGE INCREASES THAT WERE ARBITRARILY INFLATED AND NOT PROPERLY DISCOUNTED TO PRESENT DAY DOLLARS.

## III. DISCUSSION

### A. Immunity

{¶ 27} Under its first assignment of error, ODOT contends the Court of Claims erred when it found ODOT was not entitled to immunity in this case.

{¶ 28} Article I, Section 16, of the Ohio Constitution provides: "Suits may be brought against the state, in such courts and in such manner, as may be provided by law." The legislature created the Court of Claims, vesting it with "exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in section 2743.02 of the Revised Code." R.C. 2743.03(A)(1). Under R.C. 2743.02(A)(1), the state waives its immunity, with certain exceptions, and consents to be sued and "have its liability determined, in the court of claims * * * in accordance with the same rules of law applicable to suits between private parties." The "state's consent to be sued * * * preserved the state's immunity 'for its legislative or judicial functions, or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.' " *Semadeni v. Ohio Dept. of Transp.*, 75 Ohio St.3d 128, 132 (1996), quoting *Reynolds v.*

*State,* 14 Ohio St.3d 68 (1984), paragraph one of the syllabus.  "Those functions are not engaged in by private parties." *Id.* However, "once such a basic policy decision has been made, and the state has determined to engage in a certain activity or function, 'the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities.' " *Id.*, quoting *Reynolds* at paragraph one of the syllabus.

{¶ 29} The Supreme Court of Ohio has recognized that "setting a timetable for implementation of a discretionary decision itself involves the exercise of judgment." *Garland v. Ohio Dept. of Transp.*, 48 Ohio St.3d 10, 12 (1990).  However, "an agency may not delay implementation indefinitely." *Id.* Thus, "[o]nce a governmental entity has made a discretionary decision, it has a reasonable amount of time to implement that decision without incurring tort liability." *Id.* at paragraph two of the syllabus.  The availability of governmental immunity presents a question of law we review de novo. *See Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992); *Bush v. Beggrow*, 10th Dist. No. 03AP-1238, 2005-Ohio-2426, ¶ 15; *Ohio Am. Health Care, Inc. v. Ohio Bd. of Nursing*, 10th Dist. No. 13AP-1020, 2014-Ohio-2422, ¶ 13.

{¶ 30} Here, the Court of Claims found ODOT was not immune because it had constructive notice of the potholes and a reasonable amount of time to remedy them. However, the issue of constructive notice primarily relates to whether ODOT breached a duty to Miller. *See Kemer v. Ohio Dept. of Transp.*, 10th Dist. No. 09AP-248, 2009-Ohio-5714, ¶ 31 (finding ODOT did not breach duty of care to plaintiffs, in part, because it lacked actual or constructive notice of open catch basin into which plaintiff fell). Nonetheless, as we explain below, we agree immunity is not available to ODOT in this case. *See generally Reid v. Plainsboro Partners, III*, 10th Dist. No. 09AP-442, 2010-Ohio-4373, ¶ 20 (stating "an appellate court need not reverse an otherwise correct judgment merely because the trial court utilized different or erroneous reasons as the basis for its determination").

{¶ 31} ODOT contends its decision to not immediately repair a pothole when performing snow and ice removal following a winter storm is a discretionary decision that entitles it to immunity.  ODOT emphasizes the fact that it has 650 miles of roadway to maintain in Columbiana County.  According to ODOT, its decision on how to best utilize

its resources is a policy decision entitling it to immunity. In the case ODOT quotes for this proposition, the Court of Claims found "ODOT's decision as to whether to implement a particular program, or how to best utilize its resources to maintain * * * catch basins" was entitled to immunity. *Townsend v. Ohio Dept. of Transp.*, Ct. of Cl. No. 2008-11044, 2011-Ohio-3875, ¶ 27. However, this case does not involve catch basins, and, in any event, *Townsend* is not binding on this court.

{¶ 32} "Were we to find that discretionary immunity applies every time a state employee exercises discretion in performing his or her job, we would be vastly expanding the scope of the discretionary immunity doctrine while simultaneously limiting the scope of the state's waiver of sovereign immunity from liability as established by the Court of Claims Act." *Foster v. Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-503, 2013-Ohio-912, ¶ 23. As appellee points out, a finding that ODOT is entitled to immunity for the existence of a road hazard simply because road maintenance involves choices about how to allocate resources like equipment and personnel would eviscerate the state's general duty to maintain its highways in a reasonably safe condition for the traveling public. *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 9, citing *Knickel v. Dept. of Transp.*, 49 Ohio App.2d 335 (10th Dist.1976).

{¶ 33} In the context of political subdivision immunity for failure to maintain road signs, the Supreme Court of Ohio has stated: "Overhanging branches and foliage which obscure traffic signs, malfunctioning traffic signals, signs which have lost their capacity to reflect, or even physical impediments such as potholes, are easily discoverable, and the elimination of such hazards involves no discretion, policy-making or engineering judgment. The political subdivision has the responsibility to abate them and it will not be immune from liability for its failure to do so." *Franks v. Lopez*, 69 Ohio St.3d 345, 349 (1994). Additionally, this court has found ODOT's decision to expand a state route was a discretionary decision under *Reynolds* but maintenance of the route was a "ministerial function for which the state may be held liable for its negligence." *Burns v. Ohio Dept. of Transp.*, 39 Ohio App.3d 126 (10th Dist.1987), paragraph one of the syllabus. *See also Malone v. Chillicothe*, 4th Dist. No. 05CA2869, 2006-Ohio-3268, ¶ 27 (finding city's decision regarding sewer repair was not a discretionary decision entitled to immunity

under R.C. 2744.03(A)(5)[5] because city had "a duty to properly maintain its sewers and cannot shirk its duty by claiming that the decision to properly maintain the sewers involved discretion in allocating limited financial resources and personnel").

{¶ 34} In contrast, in *Garland*, the Supreme Court of Ohio addressed whether ODOT's decision as to what type of traffic control device to install at an intersection was entitled to immunity. The court explained it previously held in *Winwood v. Dayton*, 37 Ohio St.3d 282 (1988), "that a municipality's decision whether to install a traffic control signal deserves the protection of sovereign immunity because such a decision requires the exercise of independent judgment and consideration of a number of factors." (Emphasis deleted.) *Garland* at 12; *see Winwood* at 284 (specifying those factors included "the regulation of traffic patterns and traffic flow at the specific location and in surrounding areas, fiscal priorities, safety, and various engineering considerations"). The *Garland* court found "[t]he same is true of an ODOT decision as to *what type* of traffic control device to install at a particular intersection, a decision that requires the same kind of expert evaluation." (Emphasis sic.) *Id.* at 12.

{¶ 35} The record is devoid of any evidence that ODOT must make a similarly complex evaluation every time it decides when to fill a pothole. But more importantly, in this case, ODOT did not demonstrate its failure to repair the potholes at issue involved the exercise of an executive or planning function involving the making of a basic policy decision characterized by the exercise of a high degree of official judgment or discretion. *Reynolds*. Miner testified the potholes he observed on March 6 did not require immediate repair but he intended to have them fixed. However, he did not record any information about the potholes, and there is no evidence he scheduled S.R. 165 for repairs before the accident. ODOT argues it was busy with snow and ice control before the accident and patching potholes, primarily on routes with more traffic than S.R. 165. ODOT even hired auxiliary crews to assist with this work. Also, Ray testified to his belief that "in a general sense" crews were patching routes with more traffic than S.R. 165 before the accident. (June 3, 2011 Tr. Vol. III, 730.)

---

[5] R.C. 2744.03(A)(5) provides political subdivisions with immunity "from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 36} Nonetheless, no one from ODOT testified about if or how the patched routes were actually selected for priority over S.R. 165. Not all of the patched routes were busier than S.R. 165. Moreover, Miner testified factors such as a pothole's size and location on the roadway, i.e., in the wheel track or not, impact whether it is a hazard. It stands to reason factors other than traffic volume would impact a decision on how to prioritize routes for pothole patching. Thus, we find it difficult to conclude the delay in repairs occurred because ODOT exercised a high degree of official judgment or discretion in deciding to dedicate its limited resources and personnel to more pressing road hazards as opposed to inattentiveness.

{¶ 37} ODOT suggests the decision Miner made on March 6 that the potholes needed fixed was itself a discretionary decision, and ODOT had a reasonable time to implement that decision under *Garland* without incurring liability. However, we fail to see why the determination that 2 inch deep, 12 inch long, and 8 inch wide potholes should be filled qualifies as a discretionary decision entitled to immunity under the *Reynolds* standard.

{¶ 38} Finally, ODOT claims the magistrate found ODOT had constructive notice of the potholes that existed on March 11 because Miner saw smaller potholes on March 6 and ODOT knows potholes are unpredictable. ODOT contends this finding is "in direct contravention of the doctrine of discretionary immunity" and imposes strict liability on it. (Appellant's Brief, 13.) However, ODOT misunderstands the basis for its constructive notice in this case, which we discuss in more detail below.

{¶ 39} For the foregoing reasons, we conclude ODOT was not entitled to immunity and overrule the first assignment of error.

B. Negligence

{¶ 40} " 'To maintain an action for damages for wrongful death upon the theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, *i.e.*, the duty to exercise ordinary care, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death.' " *Galay v. Ohio Dept. of Transp.*, 10th Dist. No. 05AP-383, 2006-Ohio-4113, ¶ 7, quoting *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966), paragraph one of the syllabus.

## 1. <u>Duty and Breach</u>

{¶ 41} " 'Whether a duty exists in a negligence action is a question of law.' " *Kemer* at ¶ 16, quoting *Benton v. Cracker Barrel Old Country Store, Inc.,* 10th Dist. No. 02AP-1211, 2003-Ohio-2890, ¶ 11. The state has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Sparre* at ¶ 9. ODOT does not dispute it had such a duty to Miller as a member of the traveling public. However, ODOT maintains it did not breach its duty.

{¶ 42} Whether the defendant breached a duty is normally a question of fact for the trier of fact to decide. *Kemer* at ¶ 16. The state "is not an insurer of the safety of travelers on its highways." *Sparre* at ¶ 9, citing *Rhodus v. Ohio Dept. of Transp.*, 67 Ohio App.3d 723 (10th Dist.1990). Therefore, ODOT is not liable for damages caused by hazards on state highways unless ODOT had actual or constructive notice of the hazard and failed to remedy it. *Id.* at ¶ 9, citing *McClellan v. Ohio Dept. of Transp.*, 34 Ohio App.3d 247, 249 (10th Dist.1986); *see Kemer* at ¶ 20.

{¶ 43} Under its second assignment of error, ODOT contends the Court of Claims' finding that ODOT had constructive notice of the potholes at issue is against the manifest weight of the evidence. Weight of the evidence concerns " ' "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 19, citing *Eastley* at ¶ 20.

{¶ 44} In applying the manifest weight standard, "the court of appeals 'must always be mindful of the presumption in favor of the finder of fact.' " *Id.*, quoting *Eastley* at ¶ 21. "A trial court's findings of fact are presumed correct, and 'the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to decide.' " *Rex v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 13AP-397, 2013-

Ohio-5110, ¶ 18, quoting *Eagle Land Title Agency, Inc. v. Affiliated Mtge. Co.*, 10th Dist. No. 95APG12-1617 (June 27, 1996).

{¶ 45} "Actual notice exists when the relevant information has been permanently communicated to or received by the noticed party in the form of express or direct information." *Sparre* at ¶ 23, citing *Lucero v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 11AP-288, 2011-Ohio-6388. " 'Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice.' " *Id.*, quoting *Hughes v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 09AP-1052, 2010-Ohio-4736, ¶ 14. "To support an inference of constructive notice, a plaintiff may submit evidence to establish the length of time that a condition existed, and thereby show that the defendant should have acquired knowledge of its existence." *Id.*; *see also Presley v. Norwood*, 36 Ohio St.2d 29, 32 (1973), quoting *Johnson v. Wagner Provision Co.*, 141 Ohio St. 584 (1943) (stating to support an inference of constructive notice, there must be evidence "sufficient to indicate that a dangerous condition has '* * * existed for a sufficient time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.' "); *Kemer* at ¶ 24 ("Constructive notice of a defective condition can be imputed to a defendant when the plaintiff presents evidence establishing that the defect could or should have been discovered."). "The requisite length of time a condition must exist to establish constructive notice varies with each specific situation." *Id.* at ¶ 25, citing *Danko v. Ohio Dept. of Transp.*, 10th Dist. No. 92AP-1183 (Feb. 4, 1993).

{¶ 46} ODOT disagrees with the finding that by March 9 it had constructive notice of the condition the potholes were in at the time of the accident. First, ODOT suggests the potholes present on March 11 were not the same potholes Miner saw on March 6. According to ODOT, Ray testified potholes of this nature could "literally occur within hours." (Appellant's Brief, 23.) ODOT does not provide a citation to the record for this testimony, and we found no such testimony in our review of the transcript. Also, even though Miner failed to document the precise location of the potholes he saw, Rieseck and Lipp observed potholes in the relevant portion of S.R. 165 even before March 6. ODOT argues Rieseck lacks credibility for various reasons, such as his friendship with the Millers' son and his inability to recall some details of his call to ODOT. However, Lipp

had no connection to Miller, and ODOT fails to explain its allegation that Lipp's testimony was "emotionally-charged." (Appellant's Brief, 20.) ODOT also complains Filippino's opinion about when the potholes developed is unreliable. However, it does not appear the magistrate or Court of Claims placed much weight on his testimony. In any event, his opinion that the potholes took more than one day to develop is corroborated by the eyewitness testimonies of Lipp and Rieseck. In addition, contrary to ODOT's suggestion, the absence of documented complaints to ODOT and OSHP about a five-inch deep pothole on S.R. 165 before the accident does not prove the potholes developed overnight. Based on the testimony of Rafferty and Giauque, it is questionable whether ODOT or OSHP would have recorded such calls even if they were made.

{¶ 47} Appellee presented evidence, in part through Lipp's testimony, that ODOT plowed S.R. 165 on March 9 and by that time the potholes had deteriorated to the same condition they were in during the accident. ODOT contends Lipp's testimony that it plowed S.R. 165 on March 9 is speculative. However, it is undisputed ODOT is responsible for plowing S.R. 165 and engaged in plowing operations in Columbiana County on March 9. Lipp testified S.R. 165 was not plowed when he went to church on March 9, but by the time he came home S.R. 165 was plowed. Moreover, Lipp testified in the over 50 years he lived on S.R. 165, he never observed anyone plow S.R. 165 except for ODOT. Thus, it is reasonable to infer ODOT plowed S.R. 165 on March 9.

{¶ 48} ODOT contends Lipp could not reliably testify the potholes he saw on March 9 were the same size and shape as the potholes present on March 11. ODOT argues on March 9, Lipp did not stop and measure the potholes and was distracted by the imprint in the snow bank. ODOT also argues on March 11 Lipp viewed the potholes from 25 yards away. However, ODOT only speculates Lipp was too distracted to observe the condition of the potholes on March 9, and Lipp's failure to measure the potholes does not make his testimony so unreliable that the Court of Claims could not credit it. The fact that Lipp observed the potholes from 25 yards away on March 11 is not pertinent because, at trial, Lipp testified a photograph of the potholes taken after the accident fairly and accurately depicted their condition on March 9. The Court of Claims was free to believe this testimony. Although ODOT suggests Lipp might have lied about the potholes in light of his failure to report them to a government agency, Lipp reasonably explained he

thought this was unnecessary. Lipp thought an ODOT plow struck the potholes and went into a snow bank on March 9, so the problem would be fixed.

{¶ 49} Next, ODOT claims even if it plowed S.R. 165 on March 9 and the potholes were already in the condition they were in during the accident, it is still unreasonable to infer ODOT could have learned about the potholes that day. ODOT contends Lipp only speculated its plow struck the potholes based on the imprint in the snow bank and "[a]nyone with a pick-up truck could have left a plow imprint in the snow." (Appellant's Brief, 20.) ODOT also argues there is no evidence the plow driver could have seen or felt the potholes given the heavy snowfall. Even putting aside Lipp's opinion that the plow struck the potholes, the potholes were still in the traveled part of the roadway, covered an area over 27 feet long and up to 24 inches wide, and were visible to Lipp on March 9, presumably after S.R. 165 had been plowed. We find no error in the conclusion that ODOT could or should have discovered these potholes on March 9 and had sufficient time to remedy the hazard before the March 11 accident. *See generally Pompignano v. Ohio Dept. of Transp.*, Ct. of Cl. No. 2005-02117-AD, 2005-Ohio-3976, ¶ 8 (finding ODOT had constructive notice of pothole that formed more than 12 hours prior to plaintiff's property damage event).

{¶ 50} Because the constructive notice finding was not against the manifest weight of the evidence, we overrule the second assignment of error.

## 2. Foreseeability

{¶ 51} Under its third assignment of error, ODOT contends the accident was unforeseeable. However, ODOT does not argue it was unforeseeable the potholes could cause an accident, but, instead, reiterates many points it made with regard to immunity and its priorities in the days leading up to the accident. ODOT also argues it properly maintained S.R. 165 as evidenced by records of pothole patching it performed in the months before the accident. It is unclear how these arguments relate to the assigned error. In addition, ODOT argues it could not have foreseen development of potholes of the magnitude that existed on March 11 and cannot be liable absent "direct notice" of those potholes. (Appellant's Brief, 25.) However, regardless of whether ODOT could have predicted that the March 6 potholes would deteriorate to the condition they existed in at the time of the accident, ODOT still had constructive notice on March 9 of potholes on

S.R. 165 in the same condition as they existed at the time of the accident. ODOT failed to repair those potholes before the accident. ODOT's inability to foresee the evolution of the March 6 potholes does not somehow excuse that failure.

{¶ 52} Accordingly, we overrule the third assignment of error.

### 3. Proximate Cause

{¶ 53} Under its fourth assignment of error, ODOT contends the Court of Claims' findings regarding proximate cause were against the manifest weight of the evidence. Specifically, ODOT contends Goscenski did not strike the potholes, so ODOT's failure to repair them did not proximately cause the accident. ODOT argues that, even if its conduct was a proximate cause of the accident, the Court of Claims should have apportioned some liability to Goscenski, who was also a proximate cause of the accident because he was speeding, in a hurry, lost control, and went left of center.

{¶ 54} Whether a breach proximately caused an injury is normally a question of fact for the trier of fact to decide. *Kemer* at ¶ 16. "If an injury is the natural and probable consequence of the alleged negligent act, then that act is the proximate cause of the injury." *Taylor v. Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-1156, 2012-Ohio-4792, ¶ 22, citing *Sutowski v. Eli Lilly & Co.*, 82 Ohio St.3d 347, 351 (1998). "To find that an injury was the natural and probable cause of an alleged negligent act, it must appear that the injury complained of could have been foreseen or reasonably anticipated from the act." *Id.*, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). " 'There may be more than one proximate cause of an injury.' " *Id.*, quoting *Taylor v. Webster*, 12 Ohio St.2d 53, 57 (1967).

{¶ 55} ODOT maintains Goscenski did not hit the potholes, and his conduct was the sole proximate cause of the accident. ODOT claims the only evidence Goscenski hit the potholes is his own testimony, which is not credible. However, Trooper Jones' investigation did not reveal any possible cause for the accident other than Goscenski striking a pothole. Moreover, Lipian opined the truck struck the potholes, and, as we explain below, the Court of Claims was free to credit the testimony of Goscenski and accept Lipian's opinion over that of Tuttle.

{¶ 56} ODOT contends Tuttle performed the only full accident reconstruction in this case whereas Lipian did not calculate the truck's speed or perform calculations to

support his claims about the truck's path of travel. However, Lipian testified too many unknown variables existed to perform a full reconstruction that included items like an accurate speed calculation. The Court of Claims was free to credit this testimony and disregard the speed calculation by Tuttle. ODOT also argues Lipian's testimony that the truck hit the potholes and went completely left of center to strike Miller's vehicle head-on in 1.3 seconds is not credible. ODOT suggests Lipian testified the truck was entirely within the northbound lane when it struck Miller's vehicle. However, Lipian opined the impact occurred at an angle. Moreover, ODOT fails to explain why it is not plausible that the truck hit the potholes and struck Miller's vehicle 1.3 seconds later.

{¶ 57} In addition, ODOT contends Lipian is not reliable because he used the wrong manufacturer, make, and model for the truck in his first expert report. However, Lipian explained the registration information for the truck mistakenly identified it as a 2000 Freightliner. When Lipian inspected the truck, he learned it was a 1999 International. The only impact this information had on Lipian's work was to slightly alter the dimensions of the truck on his scale drawing of the accident scene.

{¶ 58} ODOT also argues Lipian is not reliable because he failed a national test for accident reconstruction experts the first time he took it. ODOT refers to a test Lipian took through the Accreditation Commission for Traffic Reconstruction ("ACTAR"). Lipian testified a person could be a qualified reconstructionist without ACTAR accreditation, and it took him two tries to pass one portion of the test. We fail to see why this required the Court of Claims to disregard Lipian's opinions.

{¶ 59} Next, ODOT argues the truck did not hit the potholes as evidenced by the fact that the tires remained inflated post-accident and did not sustain significant rim damage. However, Lipian testified the front right tire had distress marks consistent with striking an abrupt, sharp edge, and one of the potholes had an edge like a vertical cliff face. ODOT claims Tuttle showed the tread mark in the potholes differed from the truck tires in this case. However, the Court of Claims was free to credit Lipian's testimony that the tread mark was consistent with the truck's front right tire. ODOT emphasizes the absence of yaw marks at the scene and failure of the truck to roll over, but the Court of Claims was free to credit Lipian's testimony that impact with the potholes would not have produced those results. In addition, ODOT complains "[n]o explanation was offered as to

why the truck driver would have lost control if only his front right tire hit the pothole while his dual rear wheels [rode] over it."   (Appellant's Brief, 31.)   However, Lipian explained that if a tire hit the end of the pothole with a steep ending, there would be a hard jerk to the right side of the vehicle and a force would transmit through the steering wheel, causing the driver to lose control of the vehicle.

{¶ 60} ODOT argues Goscenski had a motive to lie to avoid responsibility for the accident.   ODOT suggests Goscenski is not credible because Lipian questioned whether Goscenski was wearing a seatbelt at the time of the accident as he claimed.   However, Lipian could not say with certainty whether Goscenski was wearing a seat belt.   ODOT argues Goscenski gave inconsistent testimony about whether striking the potholes knocked the steering wheel out of his hands.   Also, ODOT argues that at trial, when asked whether he hit his horn, Goscenski testified, "No.   I don't believe I - - I may have.   I'm not sure."   (Dec. 6, 2010 Tr. 98.)   ODOT contends Goscenski said he was not sure after realizing he was going to be impeached.   Aside from the speculative nature of this argument, the Court of Claims was aware of these issues with Goscenski's testimony, which are relatively minor, and still chose to believe him.

{¶ 61} ODOT also argues that Goscenski testified the accident occurred at 6:45 a.m., even though he told OSHP it was 7:18 a.m., to give the impression he had enough time to get to his doctor's appointment without speeding.   ODOT claims if the accident was at 7:18 a.m., Goscenski would have been late if he drove the speed limit because he was 45 minutes away from the truck depot and then had to travel 10 additional miles to the doctor's office.   But using that time frame, Goscenski would have arrived at the depot by 8:03 a.m., and we fail to see why it is implausible that he could have traveled an additional 10 miles in 27 minutes in the absence of any information about the route he planned to take from the depot to the doctor's office. The Court of Claims was free to believe Goscenski's testimony that he was not speeding.   This testimony was bolstered by that of both Trooper Jones and Lipian.

{¶ 62} Next, ODOT contends Goscenski is not credible because his sequence of events is improbable.   Specifically, ODOT argues he testified 20 seconds elapsed between hitting the potholes and Miller's vehicle, and 45 seconds elapsed between hitting the potholes and the truck stopping.   ODOT does not explain why this is implausible, and, in

any event, it is understandable Goscenski would have a skewed perception of time during a presumably traumatic experience.

{¶ 63} For these reasons, the Court of Claims' finding that Goscenski struck the potholes and thus ODOT's failure to repair the potholes proximately caused the accident was not against the manifest weight of the evidence.

{¶ 64} Next, ODOT contends even if its failure to repair the potholes proximately caused the accident, the Court of Claims should have apportioned some liability to Goscenski under R.C. 2307.23. R.C. 2307.23(A)(2) provides that in certain tort actions, the court in a nonjury action shall make findings of fact specifying the "percentage of tortious conduct that proximately caused the injury or loss to person or property or the wrongful death that is attributable to each person from whom the plaintiff does not seek recovery in this action." R.C. 2307.23(C) states: "For purposes of division (A)(2) of this section, it is an affirmative defense for each party to the tort action from whom the plaintiff seeks recovery in this action that a specific percentage of the tortious conduct that proximately caused the injury or loss to person or property or the wrongful death is attributable to one or more persons from whom the plaintiff does not seek recovery in this action." It is " 'well settled in Ohio that the defendant asserting an affirmative defense has the burden of proof in establishing such defense.' " *Olentangy Condo. Assn. v. Lusk*, 10th Dist. No. 09AP-568, 2010-Ohio-1023, ¶ 23, quoting *MatchMaker Internatl., Inc. v. Long*, 100 Ohio App.3d 406, 408 (9th Dist.1995).

{¶ 65} As we already indicated, the Court of Claims was free to believe Goscenski's testimony that he was not speeding. The Court of Claims was also free to disregard Tuttle's speed calculation, particularly in light of the court's determination that contrary to Tuttle's testimony, the truck did contact the potholes. Moreover, Lipian opined a driver in a vehicle striking the potholes would likely lose control above 42.56 m.p.h.—well below the posted speed limit. ODOT suggests the accident occurred because Goscenski was tired from working long and unusual hours and driving an unfamiliar truck on a route he had not traveled in months. However, Goscenski was an experienced truck driver and gave uncontradicted testimony his work schedule complied with federal law. Regardless of how frequently Goscenski drove on S.R. 165, Goscenski testified he could not see the potholes before striking them. Rieseck confirmed the potholes were only visible a second

or two before a driver encountered them. Also, Lipian opined given the hill and other conditions, Goscenski did not have time to perceive the potholes and react to avoid hitting them.

{¶ 66} ODOT points to no evidence of what Goscenski could have done to avoid the potholes or striking Miller's vehicle once his right front tire hit the potholes. ODOT's expert gave no opinion on this issue given his position that Goscenski never struck the potholes.[6] Although Trooper Jones listed Goscenski's failure to control as a contributing factor to the accident on the OSHP report, the report indicates Trooper Jones did not charge him with any offense. Moreover, Trooper Jones did not testify about what, if anything, Goscenski could have done to control the truck. Trooper Jones admitted his investigation did not reveal any possible cause for the accident aside from Goscenski striking the pothole. Therefore, the Court of Claims' finding that ODOT did not prove its apportionment defense was not against the manifest weight of the evidence.

{¶ 67} Our recent decision in *Goscenski v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-585, 2014-Ohio-3426, is not inconsistent with this result. That appeal stemmed from the Court of Claims' judgment in the separate action which was tried with the present matter during the liability phase of proceedings. In *Goscenski*, the plaintiffs, who included Goscenski, appealed the Court of Claims' decision to grant ODOT judgment on the pleadings with regard to their claim for indemnification from ODOT. *Id.* at ¶ 1, 4. In their complaint, the plaintiffs alleged ODOT's negligence proximately caused Miller's damages and "their liability to Miller was 'merely secondary and passive as compared to the active and primary negligence and liability of ODOT.' " *Id.* at ¶ 3. The plaintiffs sought indemnification from ODOT "for all sums they paid to Miller." *Id.*

{¶ 68} In affirming the Court of Claims' decision, we explained that "[t]o have a right to indemnity under the active/passive negligence theory, a party must be passively negligent." *Id.* at ¶ 22, citing *Lingo v. Ohio Cent. R.R., Inc.*, 10th Dist. No. 05AP-206, 2006-Ohio-2268, ¶ 37. We further explained:

---

[6] In the conclusion of its brief, ODOT complains the evidence does not indicate why the truck went left instead of right after striking the potholes. ODOT did not incorporate this contention into the argument section of its brief. Moreover, we do not believe the absence of specific evidence on this point renders the Court of Claims' ruling on proximate cause against the manifest weight of the evidence. We note Rieseck testified contact with the potholes caused his and other vehicles to move left.

> Here, as alleged in the complaint, Goscenski's negligence constituted driving over the centerline. This was an affirmative act, not a failure to act where a duty to act existed. Goscenski, therefore, was actively negligent. Consequently, plaintiffs are not entitled to indemnification under the active/passive negligence theory.

*Id.* at ¶ 23.

{¶ 69} This court did not actually find Goscenski was negligent because he drove over the centerline. That issue was not before us. Instead, our review was limited to the allegations in the pleadings. *Id.* at ¶ 8. Therefore, we had to disregard the factual findings the Court of Claims made after the liability trial. *Id.* The focus of our decision was the fact that in the complaint, Goscenski's alleged negligent act was an affirmative act, not a passive one. Therefore, even construing the material allegations in the complaint in favor of the plaintiffs, the plaintiffs could prove no set of facts that would support a claim for indemnification under the active/passive negligence theory. *Id.* at ¶ 7, 25.

{¶ 70} Even though Goscenski was a plaintiff in the *Goscenski* case, and the complaint alleged his own negligence, that fact does not impact our apportionment analysis in this case. Our review of the assigned error is limited to evidence adduced at the liability trial, which does not include allegations made in the pleadings in *Goscenski*.

{¶ 71} Accordingly, we overrule the fourth assignment of error.

## C. Economic Damages

{¶ 72} Under its fifth assignment of error, ODOT contends the Court of Claims' award for economic damages, i.e., loss of support and services, was against the manifest weight of the evidence for reasons we elaborate on below.

{¶ 73} R.C. 2125.02(A)(2) provides:

> The jury, or the court if the civil action for wrongful death is not tried to a jury, may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries described in division (A)(1) of this section by reason of the wrongful death * * *.

{¶ 74} R.C. 2125.02(B) states:

Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:

(1) Loss of support from the reasonably expected earning capacity of the decedent;

(2) Loss of services of the decedent[.]

"In determining the amount of damages to be awarded, the jury or court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death." R.C. 2125.02(A)(3)(b)(i).

{¶ 75} First, ODOT claims Dr. Burke is biased based on his admission that the majority of times he has been approached to "conduct this sort of analysis," it was by plaintiffs. (Appellant's Brief, 34.) However, the fact that more plaintiffs than defendants have approached Dr. Burke does not prove he is biased in favor of plaintiffs. ODOT argues Dr. Burke's bias is evidenced by his disagreement with personal consumption deductions, i.e., reducing a decedent's future earnings to account for money the decedent would have consumed if she had lived. However, despite his personal beliefs, Dr. Burke testified he made a deduction for personal consumption in the case because state law required he do so.

{¶ 76} Next, ODOT complains Dr. Burke worked for the law firm appellee hired more than 100 times and gave the firm a $900 price break in this matter but could not explain why. In addition, Dr. Burke was paid $1,200 for up to two hours of testimony in this case. However, the Court of Claims was aware of Dr. Burke's history and fees but still chose to credit several of his calculations. We cannot say these issues made Dr. Burke so unreliable the court erred in doing so.

{¶ 77} In addition, ODOT contends Dr. Burke improperly calculated Miller's expected earnings beyond her statistical work-life expectancy. ODOT complains it is unlikely Miller would have kept up her demanding two-job work schedule after age 59.3, particularly given all of the unforeseeable events that can remove a person from the workforce, such as layoffs. ODOT contends the DOL statistics account for these events and takes issue with the fact Dr. Burke acknowledged usefulness of the DOL statistics, but at the request of appellee's counsel, calculated Miller's earning capacity using older

retirement ages. ODOT argues there is no way to say with certainty that Miller would have continued to work at her two jobs as she did at the time of the accident until age 67, 70 or 75 "as Dr. Burke projected." (Appellant's Brief, 40.)

{¶ 78} However, Dr. Burke did not testify Miller would have worked until the retirement ages he used in his calculations. He simply provided the court with earnings calculations using different retirement ages. True, he did not calculate earnings for a retirement age of 59.3. However, the Court of Claims found Miller would have retired at 66 years and 10 months based on the testimony of appellee and Turjanica, not the testimony of Dr. Burke. "Predictions about future-earning capacity are necessarily somewhat speculative." *Adae v. State*, 10th Dist. No. 12AP-406, 2013-Ohio-23, ¶ 39, citing *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 726 (6th Cir.2012), citing *Eastman v. Stanley Works*, 180 Ohio App.3d 844, 2009-Ohio-634 (10th Dist.). "An exact calculation of what the plaintiff could have earned but for her injury is not required; the plaintiff must prove damages with reasonable certainty." *Id.*, citing *Andler* at 726, *Eastman* at ¶ 24.

{¶ 79} "When calculating earning capacity, experts often consult actuarial tables, Bureau of Labor Statistics figures or other averages along with the plaintiff's historical earnings." *Id.*, citing *Andler* at 728, and *Taylor v. Freedom Arms, Inc.*, 5th Dist. No. CT2008-0071, 2009-Ohio-6091, ¶ 16. However, ODOT directs this court to no authority in support of its suggestion that the Court of Claims had to rely on the statistical work life expectancy calculated by the DOL in determining damages for loss of support. Again, "[i]n determining the amount of damages to be awarded, the * * * court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death." R.C. 2125.02(A)(3)(b)(i). Here, appellee presented evidence of Miller's good health and the pleasure she took in her work. The court considered this evidence, along with Miller's demanding work schedule, in determining she would have worked beyond her statistical work life expectancy but not after Social Security retirement age.

{¶ 80} Next, ODOT contends Dr. Burke's method of calculating Miller's future earnings was unreliable. Specifically, ODOT challenges Dr. Burke's use of the ECI to project Miller's wages from the time of death to the present. ODOT argues the salaries of

three of Miller's co-workers who performed the same job as her were available to show what she would have actually earned during this time frame. ODOT also complains in calculating future wages, Dr. Burke only used the last three years of Miller's earnings instead of looking at her earnings since she entered the workforce in 1977.

{¶ 81} However, Dr. Burke testified he was unaware Miller had three co-workers in the same position as her. There is no evidence of what these co-workers earned or how they compared to Miller in terms of experience. Their earnings could have exceeded those Dr. Burke projected. Moreover, we cannot say Dr. Burke's reliance on the ECI, and the Court of Claims' acceptance of this methodology, is improper simply because Dr. Burke could have used a different method. Additionally, ODOT provides no explanation for why Dr. Burke's use of Miller's last three years of earnings was improper. It seems logical as Miller gained experience in the workforce, her earnings would grow to reflect that experience and would more closely match her earnings at the time of death than her earnings in the 1970s.

{¶ 82} In addition, ODOT argues Dr. Burke used speculative interest rates in his calculations. Specifically, ODOT complains in his first report, Dr. Burke used projections the United States Department of the Treasury (the "Treasury") made for interest rates in the next 30 years. However, in his second and third reports, ODOT claims Dr. Burke "took one day from the past, looked at the interest rate on treasury bills on that day, and used that interest rate to project forward his 20 to 30 years of earnings." (Appellant's Brief, 41.) ODOT contends the day Dr. Burke picked was one when interest rates were at historic lows due to an economic crisis in the United States. ODOT suggests Dr. Burke picked this day to increase the damages award in this case.

{¶ 83} However, Dr. Burke explained the interest rates he used in all of his reports came from the Treasury. The rates from the Treasury in his first report were nominal rates, i.e., they did not account for inflation, so Dr. Burke had to perform his own inflation calculations. Since that time, the Treasury started providing real interest rates, i.e., rates that consider inflation, so in subsequent reports Dr. Burke did not have to do those calculations. Dr. Burke testified interest rates fell between the creation of his first and third reports. In compiling his most recent report in September 2012, he used interest rates he retrieved from the Treasury's daily real yield curve rates on September 4, 2012.

He looked at the interest rates for investments in short and long-term Treasury instruments that day; he did not make a personal prediction about future interest rates. Based on the record before us, we cannot say this method is inherently unsound or that the rates Dr. Burke used were too speculative. Moreover, nothing in the record supports ODOT's contention Dr. Burke used the rates from September 4, 2012 because they were historically low as opposed to him using the most recent rates available when he updated his report in September 2012.

{¶ 84} Next, ODOT contends Dr. Burke arbitrarily determined Miller provided four hours of household services each day. ODOT contends there is no evidence to this effect, and it is unreasonable to believe Miller provided four hours of services per day while working two jobs. However, Dr. Burke did not testify, and the Court of Claims did not find, that Miller provided four hours of household services each day. Rather, Dr. Burke explained that in his calculations, he used a DOL study on average hours of household work. Specifically, he used the study's averages of 2.55 hours per day pre-retirement and 3.74 hours per day post-retirement. The study comports with ODOT's suggestion that employed people have less time for household work than retired or unemployed people.

{¶ 85} ODOT also complains Dr. Burke's lost services calculations for a live-in housekeeper and a housekeeper paid $15 per hour use arbitrary hourly wage figures. However, the Court of Claims did not rely on these calculations and instead used Dr. Burke's minimum wage calculation. ODOT suggests that if the minimum wage calculation were correct, there would be no reason for Dr. Burke to provide the other calculations he did. We fail to see how the mere fact that Dr. Burke provided the court with calculations of different ways appellee could replace lost services renders Dr. Burke's opinions unreliable. The Court of Claims considered the possibilities and chose the least expensive replacement option. Additionally, we disagree with ODOT's suggestion that appellee was not entitled to the value of Miller's lost services simply because he had not hired household help since Miller's death.

{¶ 86} Finally, ODOT argues the Court of Claims could not rely on Dr. Burke's testimony because he prepared three reports in this case, and each report contains calculations for three different scenarios for lost earnings and household services. ODOT complains Dr. Burke's calculations vary so much that they lack credibility. Dr. Burke

explained he revised his 2009 report in 2010 and again in 2012 to account for changes over time in matters such as interest rates and life expectancy statistics. Dr. Burke testified he used the same methodology in each report. Additionally, as we already indicated, Dr. Burke is not unreliable merely because he presented the court with options for Miller's lost earnings based on different retirement ages and options for the value of services based on the method of replacing those services.

{¶ 87} For the foregoing reasons we find the award for loss of support and services was not against the manifest weight of the evidence. Therefore, we overrule the fifth assignment of error.

## IV. CONCLUSION

{¶ 88} Having overruled each of the assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

TYACK and DORRIAN, JJ., concur.

———————————