[Cite as *Bailey v. Ward*, 2016-Ohio-7173.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

SHAUNA L. BAILEY,

    PLAINTIFF-APPELLANT,                 CASE NO. 8-16-03

    v.

COLIN WARD, ET AL.,                       O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Logan County Common Pleas Court
Trial Court No. CV14120385

**Judgment Affirmed**

Date of Decision: October 3, 2016

APPEARANCES:

    *R. Craig McLaughlin* **for Appellant**

    *Edward A. Dark* **for Appellee**

**ROGERS, J.**

{¶1} Plaintiff-Appellant, Shauna Bailey, appeals the judgment of the Court of Common Pleas of Logan County granting summary judgment in favor of Defendants-Appellees, Colin Ward ("Colin") and Terri Ward ("Terri") (collectively "the Wards"). On appeal, Bailey argues that the trial court erred by weighing the credibility of her expert witness in reaching its decision that summary judgment was appropriate. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On December 17, 2014, Bailey filed a complaint in the Court of Common Pleas of Logan County against the Wards alleging personal injury claims pursuant to common law negligence and Ohio's Landlord-Tenant Act. The underlying facts surrounded a slip and fall on snow and ice that occurred during the early hours of December 24, 2012, in which Bailey suffered severe injuries. Bailey leased the property, which was owned by the Wards.

{¶3} On January 8, 2015, the Wards filed their answer denying the allegations contained in Bailey's complaint.

{¶4} Discovery ensued, and Bailey, Colin, and Terri were all deposed.

*Bailey's Deposition*

{¶5} Bailey stated that she lived at 301 East Chillicothe Ave in Bellefontaine, OH in December 2012. She added that she rented a room at that address and that the Wards were her landlords.

{**¶6**} Leading up to the accident, Bailey explained that she had contacted Terri via text message several times about the steps on the porch being icy and snowy, but she could not remember exact dates as to when these conversations took place. She also did not have copies of these messages or any other proof of these conversations.

{**¶7**} Bailey stated that she slipped and fell around 4 a.m. on December 24, 2012. She explained that she was going to her mother's house to open Christmas presents with her family as it was a tradition. She added that she was wearing a winter coat, jeans, and UGG boots. Although it was dark at the time, Bailey explained that the area was sufficiently lit from streetlights to see where she was going.

{**¶8**} Next, Bailey stated, "I was walking and I was going down the steps and I lost my footing and I landed flat on my behind." (Docket No. 30, p. 39). She explained that she traversed the right side of the stairs and that she could see that there was snow on the steps. She could not remember how much snow was on the steps, but remembered that the steps were slick. Bailey stated that her boyfriend at the time of the accident would occasionally shovel snow off the porch and that neither Colin nor Terri had ever shoveled snow in the past.

{**¶9**} Bailey said that she was not aware of any defects in the porch, which included the stairs and the handrail, and said that she was holding the handrail while

going down the steps.  She added that she made it to the very end of the porch and was looking down with each step to be extra careful.

{¶10} Bailey stated that she could not remember which step, if any, on which she slipped.  Rather, she said, "I know it wasn't right at the top, but I don't remember exactly where it - - what step it was."  (*Id.* at p. 49).  She continued, "Well, I fell at the bottom.  * * * I don't know exactly where I started to fall.  I don't.  It happened really quickly."  (*Id.* at p. 50).  She stated that she believed that the slick steps caused her to fall.  She reiterated that she landed at the bottom and did not hit or land on any stairs during the fall.  Bailey added that she had already let loose of the handrail when she fell.  Then the following exchange occurred,

> Q:   Okay.  As we sit here today, you can't tell me where you slipped, correct?
>
> A:   I really can't.  I'm sorry.  I can't.

(*Id.* at p. 52).

{¶11} Bailey stated that she was unaware of anything the Wards did that would have caused an unnatural condition to exist.  Further, she added that she was unaware of any leaking in the area of the porch or the steps or the walkway after the steps.

{¶12} Bailey explained that she fell backwards and that both feet went out in front of her.  Bailey was asked to circle the area where she landed on a photograph

depicting the porch area. She then circled the area on the left handed side of the photograph and in front of the steps.

{¶13} Bailey complained that the property was not maintained well while she was there. She clarified this statement by explaining that on one occurrence another tenant had broken a pane of glass on the front door to get into the house and that the only thing done was a piece of cardboard was placed in the area of the broken glass. She also stated that the lawn would sometimes go unmown.

{¶14} As a result of the fall, Bailey stated that she suffered severe injuries to her elbow that required several surgeries as well as fractures to two of her vertebrae in her lumbar region.

*Colin's Deposition*

{¶15} Colin stated that he and Terri owned the house at 301 East Chillicothe in Bellefontaine. He said that they bought the house in 2002. He explained that they had an inspection done on the house before purchasing it. When asked what kind of inspection it was, he replied, "I think it was just what the bank required, just to make sure everything was good." (Docket No. 38, p. 16). He clarified that it was a physical inspection of the property, but stated that he was not there while the property was being inspected. Colin added that he walked through the property before deciding to purchase the home. Colin admitted that he probably could have inspected the roof, but could not remember if he had done so in the past.

{¶16} Colin explained that Terri was mainly responsible for handling the billing while he would perform maintenance. He stated that he would visit the property approximately once or twice a month. He was not aware of any drainage problems involving the property. Colin admitted that he knew that landlords had to comply with state building codes, but had never studied the codes personally.

{¶17} Colin said that he had performed some repairs to the gutters and the porch. He could not remember when he worked on the gutters, but thought that it was after Bailey fell. Regarding the gutters directly over the porch, Colin explained that he did not do any work on that portion, but explained that he had to rehang those sections. He admitted that he did not test the gutters by pouring water into the gutters to ensure that they would drain properly.

{¶18} Colin stated that he replaced the pillars on the porch back in 2009. Specifically, he added an extra pillar and replaced the old pillars. He explained that he did not take the entire roof of the porch down. Rather, he braced the roof. Additionally, Colin said that he replaced the floor on the porch. Part of the replacement included the first (top) riser of the staircase. He admitted that he never consulted the building codes before, during, or after completing the work.

{¶19} Colin stated that he and Terri were not responsible for salting the porch or shoveling snow. Rather, he claimed that he left a shovel and salt inside the front

door. During the month of December 2012, Colin could not recall ever being informed by a tenant about any problems involving snow or ice on the property.

*Terri's Deposition*

**{¶20}** Terri stated that she had never performed any maintenance on the house located at 301 East Chillicothe in Bellefontaine. She explained that she bought the template for the lease document at Staples. She added that she viewed the property before purchasing it. Terri clarified that the mortgage company was the one that ordered all the house inspections.

**{¶21}** Terri stated that when she is doing a walk through with a potential tenant she explains to them that the shovel and salt are near the front door and that they may use them when they want. She claimed that the previous owners represented that the building was in compliance with state building codes.

**{¶22}** Terri recalled receiving several text messages from Bailey complaining about other tenants, but did not remember any messages about snow or ice on the porch. She admitted that Bailey talked to her about the broken glass, but Terri did not think it was that big of a problem.

**{¶23}** Terri could not remember if it had snowed in the days leading up to December 24, 2012, but recalled that it was a mild winter and that she and Colin had driven three hours on December 24 without issue.

{¶24} On September 8, 2015, the Wards filed a motion for summary judgment. In their motion, the Wards argued: that they did not owe a duty to keep the steps clear of ice and snow; that they did not violate the terms of the lease agreement; that Bailey could not prove that the cause of her fall was an unnatural accumulation of ice and snow and that the Wards were on notice of the dangerous condition; that snow and ice are open and obvious hazards, which barred Bailey's negligence claim; and that Bailey assumed the risk by walking down icy and snowy stairs. In support of their motion, the Wards attached copies of Bailey's deposition excerpts, the lease agreement, Plaintiff's responses to Defendants' first set of interrogatories, and a photo depicting the area where Bailey thought she fell.

{¶25} Bailey filed her memorandum in opposition of the Wards' motion for summary judgment on September 23, 2015. In her memorandum, Bailey argued five reasons for why the Wards' motion should be denied. First, she argued that a genuine issue of fact existed as to whether the Wards were in violation of R.C. 5321.04 and whether this violation was a proximate cause of her injuries. Second, Bailey claimed that a violation of the Landlord-Tenant Act establishes negligence per se. Third, she argued that a genuine issue of fact existed as to whether the icy condition was an unnatural accumulation of ice and snow. Fourth, she claimed that the open and obvious doctrine does not bar liability under claims filed pursuant to the Landlord-Tenant Act. Finally, Bailey argued that assumption of risk was not

applicable under the facts. In support of her memorandum, Bailey attached the affidavit of expert witness, Thomas Huston, an engineer, and his report. That same day, Bailey filed the deposition transcripts of Colin and Terri with the court.

*Thomas Huston's Affidavit and Report*

**{¶26}** In his affidavit, Huston stated that "all of the opinions contained in [his] report [were] to a reasonable degree of engineering certain [sic] (i.e., 'more likely than not.')" (Docket No. 36, Ex. 1, p. 2). Huston's report contained the following findings.

**{¶27}** The house was constructed circa 1930. The width of the staircase was eight feet and three and a half inches and had four treads and five risers. The depths of the treads varied from 12 and three quarter inches and 13 and one quarter inches. The top three treads sloped downwards at two, two, and three degrees each respectively. The height of the risers varied from six and a half inches to six and five eighths inches. At the top of the staircase, the handrail extended 12 inches beyond the top riser, whereas the handrail ended before the bottom riser. The height of the right hand side of the handrail measured either 31 inches or 31 and one quarter inches above each respective tread.

> The roof of the front porch was metal that had been coated with a roofing material which had deteriorated. So there were several areas of exposed metal on the roof. * * * The roof of the front porch featured a box gutter. The box gutter was 10 inches wide, about ½ inch in depth, and was positioned about 4-3/4 inches away from the front or leading edge of the porch roof. The leading edge of the roof

of the porch was located at a position directly above the top tread of the stairway. * * * Over time, the surface of the top tread had been stained from precipitation dripping from the leading edge of the porch roof. * * * The height from the top tread to the leading edge of the porch roof was about 10 feet 6 inches.

(Docket No. 36, Ex. 1B, p. 2-3).

{¶28} Huston confirmed Bailey's claim that snow was on the ground on December 24, 2012 by checking the records of the National Oceanic and Atmospheric Administration's National Weather Service, which had a record of two inches falling in Bellefontaine on December 21 and about a third of an inch falling on December 22, 2012. Huston opined that the snow and ice on the stairway created a slip hazard and that the stairway, as designed, would have a tendency to create an unnatural accumulation of ice and snow.

{¶29} He reasoned that the stain on the top tread indicated that precipitation was falling off the roof and landing on this tread. Then, due to the slopes of the top three treads, the water would run down and come to rest at the bottom tread and refreeze. He added that given the discrepancies with the tread widths this fact would make it easier for a pedestrian to slip and fall. Huston found that the stairs violated sections of the 2011 and 1988 Ohio Building Codes. Section 1009.4.4 of the 2011 Code required uniformity between treads with an allowable variation of three eights of an inch. Section 816.4.2 of the 1988 Code required variation not to exceed three eighths of an inch. Huston opined that the stairway also violated section 1009.6.2

of the 2011 Code, which required that stairways be designed so that no pooling of water can occur.

{¶30} Huston explained that the handrail also violated portions of the 2011 and 1988 Codes. Specifically, section 1012.2 of the 2011 Code required that the height of a handrail be no less than 34 inches and no greater than 38 inches tall, and section 828.2.2 of the 1988 Code required the same. Here, the handrail measured between 31 inches and 31 and one quarter inches. Huston also found that the handrail violated sections 1012.6 (2011 Code) and 828.2.3 (1988 Code) because it failed to extend beyond the bottom tread by at least 12 inches. Here, the handrail ended before the bottom tread.

{¶31} Huston opined that "the presence of ice and snow on the surface of the subject stairway created a slip and fall hazard for Ms. Bailey as she descended the stairway. Further, there was an unnatural accumulation [sic] ice and snow on the stairway due to run-off from the edge of the porch roof and the configuration of the treads on the stairway." (*Id.* at p. 6). He continued, "In addition it is this investigator's opinion that Ms. Bailey fell on the bottom portion of the stairway." (*Id.*). He also opined that the design of the stairway was defective as it did not comply with the 2011 and 1988 Ohio Building Codes and that most of the defects were located near the bottom of the stairway. He concluded by opining that "[t]he

unreasonably dangerous condition of the stairway was a proximate cause of her injury." (*Id.* at p. 6-7).

{¶32} On September 30, 2015, the Wards filed their reply in support of their motion for summary judgment. In their reply, the Wards argued that the 1988 and 2011 Ohio Building Codes were not applicable to the house because the stairway was built in 1930 and was not updated, remodeled, or changed since. In support, they cited sections 101 and 3401 of the 2011 Ohio Building Code, which provided that all homes built before the effective date of that particular code were governed by "more relaxed standards." (Docket No. 40, p. 4). The Wards also argued that they lacked notice, either actual or constructive, of any defects in the stairs or the roof that would have caused an unnatural accumulation of snow and ice. Moreover, they stated that Bailey had failed to present any evidence that the defects proximately caused her injuries and attacked Huston's report as mere speculation. Specifically, Bailey could not remember where she fell, and Huston did not conduct the investigation under similar circumstances.

{¶33} The Wards suggested that Bailey had conceded both claims regarding common law negligence and breach of the lease agreement in her memorandum contra. Finally, they argued that she failed to exercise due care by assuming the risk of walking down a snowy and icy stairway in the early morning hours of a winter day.

**{¶34}** On November 20, 2015, the trial court granted the Wards' motion for summary judgment. In granting the Wards summary judgment on the breach of lease claim, the trial court noted that although the lease is silent as to snow and ice removal all parties stated in their depositions that the Wards were not expected to remove any ice or snow from the premises. Moreover, the court highlighted a section of the lease where it stated that the lessee was responsible for clearing snow off of her car and that the lessee shall keep the premises free from dirt and debris.

**{¶35}** In granting the Wards summary judgment as to Bailey's common law negligence claim, the court noted that Bailey's testimony regarding that the snowy conditions appeared natural did not support Huston's run-off theory. Moreover, the court found that Huston's report lacked any experiment results or other test results. It noted that the facts regarding snowfall were "scant" and that Huston failed to cite the snowfall as being the source of the run-off. It found that Huston failed to provide any scientific analysis of how much rain or snow was required to have fallen and melted before any run-off occurred. He failed to provide any temperature documentation or analysis that would have established his run-off theory. The court found that Huston's report did not present any questions of fact to support the run-off theory and dismissed his conclusions as speculation. Thus, the court found that Bailey's claim must fail because she slipped and fell on an open and obvious, natural accumulation of ice and snow.

{¶36} In granting the Wards summary judgment as to Bailey's statutory claim, the court found that Bailey had failed to present any evidence as to why the house, built in 1930, should be held to the standards of the 1988 and 2011 Codes. Specifically, the court found section 3401.4.1 of the 2011 Code dispositive, which stated, "Existing materials. Materials already in use in a building in compliance with requirements or approvals in effect at the time of their erection or installation shall be permitted to remain in use unless determined by the building code official to be dangerous . . ." (Docket No. 42, p. 5). The court also found that summary judgment was appropriate because of its earlier finding in regard to the lack of the proximate cause element of the negligence claim, which was also required under the statutory claim.

{¶37} Bailey filed this timely appeal, presenting the following assignment of error for our review.

*Assignment of Error*

**THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS/APPELLEES.**

{¶38} In her sole assignment of error, Bailey argues that the trial court erred by granting summary judgment in favor of the Wards. She does not challenge the court's decision granting summary judgment in favor of the Wards on her common law negligence and contract claims. Rather, she only challenges the court's decision granting summary judgment in favor of the Wards on her Landlord-Tenant Act

claim. Specifically, she argues that the trial court improperly weighed the credibility of her expert witness's testimony in reaching its decision. We disagree.

**{¶39}** An appellate court reviews a summary judgment order de novo. *Hillyer v. State Farm Mut. Auto. Ins. Co.*, 131 Ohio App.3d 172, 175 (8th Dist.1999). However, a reviewing court will not reverse an otherwise correct judgment merely because the lower court utilized different or erroneous reasons as the basis for its determination. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 25 (3d Dist.), citing *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 222 (1994). Summary judgment is appropriate when, looking at the evidence as a whole: (1) there is no genuine issue as to any material fact, and (2) the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In conducting this analysis the court must determine "that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, [the nonmoving] party being entitled to have the evidence or stipulation construed most strongly in the [nonmoving] party's favor." *Id.* If any doubts exist, the issue must be resolved in favor of the nonmoving party. *Murphy v. City of Reynoldsburg*, 65 Ohio St.3d 356, 358-359 (1992).

**{¶40}** The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material

fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). In doing so, the moving party is not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument. *Id.* at 292. The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings. *Id.*; Civ.R. 56(E).

**{¶41}** "Plaintiff-tenants seeking to establish negligence claims against defendant-landlords may do so under (1) common law premises liability, or (2) R.C. 5321 et seq., commonly referred to as the Landlord-Tenant Act." *Lyle v. PK Mgt., LLC*, 3d Dist. Hancock No. 5-09-38, 2010-Ohio-2161, ¶ 10, citing *Mounts v. Ravotti*, 7th Dist. Mahoning No. 07 MA 182, 2008-Ohio-5045, ¶ 15-17.

**{¶42}** To establish a claim for negligence against a landlord, a tenant must establish (1) the existence of a legal duty, (2) the landlord's breach of that duty, and (3) that the breach proximately caused an injury to the plaintiff. *Id.* at ¶ 11, quoting Howard *v. Chattahoochie's Bar*, 175 Ohio App.3d 578, 2008–Ohio–742, ¶ 13 (3d Dist.), quoting *Nationwide Mut. Ins. Co. v. Am. Heritage Homes Corp.*, 167 Ohio App.3d 99, 2006–Ohio–2789, ¶ 12 (3d Dist.).

**{¶43}** The Landlord-Tenant Act establishes several duties that a landlord owes his or her tenants. Two of these duties are that the landlord "[c]omply with the requirements of all applicable building, housing, health, and safety codes that

materially affect health and safety" and "[k]eep all common areas of the premises in a safe and sanitary condition[.]" R.C. 5321.04(A)(1), (3). The Supreme Court of Ohio has found that a landlord's violation of either one of these duties constitutes negligence per se. *See Mann v. Northgate Investors, L.L.C.*, 138 Ohio St.3d 175, 2014-Ohio-455, ¶ 33; *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, ¶ 23, citing *Sikora v. Wenzel*, 88 Ohio St.3d 493 (2000).

> While a statutory violation will establish negligence per se * * *, it does not eliminate the need to assess the second and third basic elements of a negligence claim. In other words, while a landlord's breach of applicable statutes may establish both the existence of a duty and the breach thereof, a plaintiff must still maintain that his injuries were proximately caused by that breach in order to maintain a negligence action.

*Thatcher v. Lauffer Ravines, L.L.C.*, 10th Dist. Franklin No. 11AP-851, 2013-Ohio-765, ¶ 7, citing *Mann v. Northgate Investors, LLC*, 10th Dist. Franklin No. 11AP-684, 2012-Ohio-2871, ¶ 25, *aff'd*, 138 Ohio St.3d 175, 2014-Ohio-455.

{¶44} An expert witness's testimony regarding proximate cause is typically sufficient to establish a question of fact to survive summary judgment. *See Harden v. Villas of Cortland Creek, L.L.C.*, 11th Dist. Trumbull No. 2012-T-0088, 2013-Ohio-4629, ¶ 26.

> The admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of probability. An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue. Inasmuch as the expression of probability is a condition precedent to the admissibility of expert

> opinion regarding causation, it relates to the competence and not its weight. Consequently, expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue.

(Citations omitted.) *Stinson v. England*, 69 Ohio St.3d 451 (1994), paragraph one of the syllabus.

**{¶45}** Expert testimony purporting to establish proximate cause has been found insufficient to establish a question of fact when the location of the slip and fall could not be pinpointed precisely. *See Holbrook v. Kingsgate Condominium Assn.*, 12th Dist. Butler No. CA2009-07-193, 2010-Ohio-850, ¶ 25 ("First, [the expert] could not pinpoint precisely where in the parking lot [either plaintiff] fell."). Courts have also found an expert's opinion insufficient when the expert performs his site inspection or tests under weather conditions dissimilar to those that existed at the time of the plaintiff's injuries. *See id.*; *Kosovich v. Florsheim Shoe Co.*, 10th Dist. Franklin No. 01AP-434, 2001 WL 1912036, *3 (Dec. 4, 2001). Further, if the expert's opinion as to proximate cause is found to be speculative, then it is not sufficient to create a question of fact. *See Holbrook* at ¶ 27; *Schutt v. Rudolph-Libbe, Inc.*, 6th Dist. Wood No. WD-94-064, 1995 WL 136777, *6 (Mar. 31, 1995). In *Schutt*, the court stated that generally summary judgment should not be granted on proximate cause *unless* "the plaintiff's evidence on the question of proximate cause is so meager and inconclusive that a finding of proximate cause would rest on

speculation and conjecture[.]" 1995 WL 136777 at *6, citing *Renfoe v. Ashley*, 167 Ohio St. 472 (1958), syllabus.

**{¶46}** After reviewing Huston's affidavit and report, we conclude that his opinion rests on speculation, and, therefore, summary judgment was appropriate.

**{¶47}** There are too many problems with Huston's report that support our conclusion that summary judgment was appropriate. First, Huston stated that he based his opinions upon not only his site inspection but also the discovery conducted through the parties, which included the depositions of Bailey and the Wards. Based on this information, Huston concluded that Bailey fell on the bottom portion of the stairway. There was only one witness who testified about where Bailey fell, Bailey herself. Although Bailey could remember which side of the staircase she descended, she could not remember where she fell. She stated several times that she could not remember if she slipped on one of the stairs or at the bottom. However, she stated that she landed not on a step (she did not hit any part of any step with any part of her body) but on the bottom. She even circled this area, past the staircase, at her deposition as the point where she landed. With this information as the only evidence provided to Huston, he could not have been able to pinpoint the location of Bailey's fall. *See Holbrook* at ¶ 25. Since Huston's run-off theory was dependent on the staircase being defective, the theory would not support Bailey's argument had she

fallen on any area other than one of the steps. Thus, this conclusion was merely speculative.

{¶48} Second, Huston failed to conduct his site inspection under similar conditions. Although humans cannot summon the weather at any second, this does not remove the duty of an expert to conduct his inspection under similar conditions. Huston conducted his inspection approximately two years after the incident. Albeit Huston conducted the inspection in December, the same month of the incident, there was absolutely no precipitation, either snow, ice, or rain, present during his inspection. When the dispositive issue involves a specific weather condition, i.e. ice and/or snow, it is not helpful when a test or inspection is performed in the absence of said condition.

{¶49} Third, although Huston provided snowfall records to support Bailey's claim that there was snow on the ground, Huston failed to provide any other meteorological information to support his run-off theory. The core concept of the run-off theory is that snow fell in the gutters. The snow, then, either froze and later thawed or thawed into water. Next, due to the construction defects of the gutter, the water overflowed from the gutter and landed on the top step. Due to the downward sloping of the top steps, the water flowed until it came to a rest on the bottom step where it refroze. Huston provided the constructional information regarding the gutters and stairway that support his theory, but failed to present any evidence

regarding temperature changes that would cause such a run-off. Without this information, Huston's run-off theory is a result of speculation and conjecture and, therefore, was insufficient.

{¶50} Even if we were to assume that Bailey had presented sufficient evidence to create an issue of fact as to negligence per se or a duty and breach of that duty, she failed to present evidence sufficient to create a question of fact as to proximate cause. Therefore, summary judgment was appropriate. *Thatcher*, 2013-Ohio-765 at ¶ 7.

{¶51} Accordingly, we overrule Bailey's sole assignment of error.

{¶52} Having found no error prejudicial to the appellant, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**