[Cite as *Estate of Mehrer v. Walgreens Specialty Pharmacy*, 2023-Ohio-2070.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Estate of Stephen A. Mehrer, | : | |
| Plaintiff-Appellant, | : | No. 22AP-286<br>(C.P.C. No. 19CV-7913) |
| v. | : | (REGULAR CALENDAR) |
| Walgreens Specialty Pharmacy et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on June 22, 2023

**On brief:** *Cooper & Elliott, LLC, Rex H. Elliott, Sean R. Alto,* and *Chelsea C. Weaver* for appellant. **Argued:** *Chelsea C. Weaver.*

**On brief:** *Crabbe, Brown & James, LLP, Robert C. Buchbinder,* and *Christopher R. Green* for appellees. **Argued:** *Christopher R. Green.*

APPEAL from Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Plaintiff-appellant, Estate of Stephen A. Mehrer ("Estate"), appeals from an April 18, 2022 decision and entry granting the motion for summary judgment of defendants-appellees, Walgreens Specialty Pharmacy ("Walgreens"), and Jyoti Navalurkar. For the reasons that follow, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In October 2009, the decedent, Stephen A. Mehrer, was a senior at Dublin Jerome High School. The decedent injured his shoulder during a football game and required surgery to repair a torn rotator cuff. On October 5, 2009, Walgreens dispensed to

the decedent 50 tablets of Hydrocodone/APAP 7.5 mg/750 mg pursuant to a prescription written by Dr. Kenneth J. Westerheide.[1]  On or around November 17, 2009, the decedent underwent surgery on his shoulder.  Also on November 17, 2009, Walgreens dispensed 60 pills of Hydrocodone/APAP 5 mg/325 mg, pursuant to a prescription by Dr. Westerheide, to the decedent.[2]  The next day, November 18, 2009, Walgreens dispenses 50 tablets of Oxycodone/APAP 5 mg/325 mg, a prescription written by Dr. Richard Fischer, to the decedent.  Five days later, on November 23, 2009, Walgreens dispensed an additional 50 tablets of Oxycodone/APAP 5 mg/325 mg, pursuant to a prescription by Dr. Westerheide, to the decedent.[3]  On November 28, 2009, Walgreens dispensed 50 tablets of Hydrocodone/APAP 7.5 mg/750 mg, written by Dr. Westerheide, to the decedent.[4]

{¶ 3}  According to the parents of the decedent, Cara and Stephen E. Mehrer, their son became addicted to drugs based on the initial opioid pills dispensed by Walgreens.  The decedent entered rehabilitation on five occasions to treat his drug addiction.  However, despite periods of sobriety, the decedent overdosed on a combination of acetyl, fentanyl, and oxycodone on October 8, 2017.

{¶ 4}  The Estate filed an amended complaint against appellees on March 10, 2020.[5]  The Estate brought causes of action for negligence (Count One), wrongful death pursuant to R.C. 2151.01, et seq. (Count Two), and respondeat superior (Count Three).  The Estate alleged that the appellees' over dispensing of medication to the decedent caused him to become addicted to opioids and ultimately overdose.  Appellees filed an answer on March 12, 2020, and the parties engaged in discovery in this matter.

{¶ 5}  Relevant to the issues in this appeal, Mr. and Mrs. Mehrer testified at their depositions that they were trying to stay ahead of the pain as the nurse recommended.  Mrs.

---

[1] The record shows that this was originally 50 tablets of Nucynta, a Schedule II drug, but was later changed to Hydrocodone. There is no dispute that Walgreens contacted the prescriber to change the type of medication.
[2] When asked how long this particular prescription was intended to last, Dr. Westerheide stated, "I would hope that this would last [the patient] three or four weeks." (Westerheide's Dep. at 24.)
[3] According to Dr. Westerheide, the decedent's father called him and requested a refill of oxycodone stating, "not the other stuff. It doesn't work. [The decedent] has been out since last night." (Westerheide's Dep. at 33.)
[4] Wagner testified during his deposition that pursuant to the Controlled Substances Act, the Drug Enforcement Administration places drugs under different schedules based on their accepted medical application. Schedule II are drugs with some medically acceptable use but considered highly addictive, and Schedule III are considered addictive, but to have less potential for harm and abuse than Schedule II drugs. In 2009, Hydrocodone was a Schedule III substance and Oxycodone was a Schedule II substance.
[5] The initial complaint was filed on October 2, 2019.

Mehrer would give the decedent one or two pills every four or six hours based on the decedent's response. They were told that the decedent had undergone a very serious and painful surgery with a painful recovery. Both Dr. Westerheide and Dr. Fischer testified that the prescriptions were reasonable and appropriate to treat the decedent's pain following his shoulder surgery. Of note, both physicians have never been disciplined for overprescribing medication.

{¶ 6} Ryan Wagner testified as the 30(B)(5) representative for Walgreens. According to Wagner, in 2009, Walgreen had a Pharmacy Code of Conduct as well as a Good Faith Practices and Fraudulent Prescription Policy for controlled prescriptions. The Good Faith Practice Policy provided that the pharmacist must ensure that a prescription for a controlled substance is dispensed for a legitimate medical purpose. Under the policy, a pharmacist:

> **must** use the elements of good faith dispensing in conjunction with state and federal controlled substance laws when filling **all** prescriptions. The pharmacist must ensure that a prescription for a controlled substance is dispensed for a legitimate medical purpose.

(Emphasis sic.) (Wagner's Dep., Ex. 3.) The policy requires a pharmacist to call the prescriber and confirm or clarify the prescription if the pharmacist believes they are unable to dispense a prescription in good faith. "This allowed pharmacists to basically deny filling or dispensing a prescription." (Wagner's Dep. at 35.) A pharmacist must also exercise professional judgment regarding a patient's continued need for controlled substances. When the elements of good faith dispensing cannot be met, the pharmacist must contact the prescriber.[6]

{¶ 7} Wagner also testified that there were safety blocks in place through Intercom Plus, Walgreen's computer system, and the pharmacists were able to see drug utilization.

---

[6] Walgreens' Good Faith Practices and Fraudulent Prescriptions procedure read in relevant part:
**Elements**
The elements of good faith dispensing that should alert a pharmacist to questionable circumstances are as follows:
- Numerous controlled substance prescriptions written by the same prescriber or several different prescribers
- Numerous prescriptions submitted by the same person
- Increased frequency of prescriptions for the same controlled drug:
  - [B]y one prescriber

This allowed pharmacists to determine if there are multiple prescriptions or how early a patient is refilling a prescription. If one of the safety blocks was triggered, the computer system would provide an alert on the monitor that reads, "[d]uplicate therapy." (Wagner's Dep. at 43). When that happened, the pharmacist would determine if the prescription was being refilled too soon, and they do so in "[c]onsultation with the patient, the caregiver, and the prescriber." *Id.*

{¶ 8} Regarding the decedent's prescription history, the computer system information has been purged and the data is no longer available. According to Wagner, Walgreens' data retention policy is six years and does not have any drug utilization review data prior to 2012. Wagner testified, outside the first prescription, that there was no affirmative evidence that Walgreens did or did not contact the prescriber about the decedent's prescriptions. Wagner also testified that Walgreens had polices in place that required patient consultation for new prescriptions. According to Wagner, all five prescriptions were considered new prescriptions and required consultation. Three of the prescriptions at issue in this case noted that consultation was declined. Mr. and Mrs. Mehrer do not recall whether or not they were offered consultation about the prescriptions.

{¶ 9} On February 15, 2021, appellees filed a motion for summary judgment arguing that the Estate's survivorship claim was untimely, the claims were precluded by the learned intermediary doctrine, and that the Estate could not demonstrate the prescriptions were the proximate cause of the injury or ultimate death of the decedent. On April 5, 2021, the Estate filed a memorandum in opposition. Relevant to the instant appeal, the Estate argued that there was a reasonable dispute of fact as to whether the five prescriptions were the cause of the decedent's death. The Estate provided an affidavit by Dr. Corey Waller as support for its claims.[7] A reply brief was filed on April 12, 2021.

---

- o [F]or large numbers of patients
- o [F]or quantities beyond those normally prescribed
- Unusual dosages or instructions in conflict with approved labelling
- Unusual geographical distances between patient, pharmacist, and prescriber
- Consistent prescriptions for habit-forming drugs
- Lack of constant prescriber/patient relationship

(Emphasis sic.) (Wagner's Dep., Ex. 3.)

[7] Dr. Waller's affidavit provides in part:

{¶ 10} On April 18, 2022, the trial court granted appellees' motion for summary judgment in its entirety. First, the trial court found that the Estate's claims for negligence and respondeat superior were precluded as the statute of limitations had expired. As for the wrongful death claim, the trial court declined to address appellees' learned intermediary theory but instead focused its analysis on causation. The trial court concluded that the Estate could not demonstrate that Walgreens' actions were the proximate cause of the decedent's death finding Dr. Waller's affidavit "speculative, and based on assumptions, not facts in the record." (Aug. 18, 2022 Decision & Entry at 28, 31.)

{¶ 11} The Estate filed a timely appeal.

## II. ASSIGNMENT OF ERROR

{¶ 12} The Estate assigns the following as trial court error:

> The trial court erred in discarding Appellant-Plaintiff's expert opinion and granting Appellee-Defendants' summary judgment motion based on lack of proximate cause. Appellant-Plaintiff's expert opinion creates a genuine issue of material fact as to proximate cause, precluding summary judgment.

## III. STANDARD OF REVIEW

{¶ 13} In determining whether the trial court properly granted summary judgment, an appellate court must review the evidence according to Civ.R. 56 as well as applicable case law. *Grange Mut. Ins. Co. v. Patino*, 10th Dist. No. 19AP-278, 2020-Ohio-466, ¶ 22.

---

It is the assertion by the defendants that there is no connection between the prescribed opioids after the decedent's shoulder injury in 2009, his subsequent diagnosis of opioid use disorder, and untimely death in 2017. It is my opinion after review of the materials made available to me by the plaintiffs' attorney, and based upon a reasonable degree of medical certainty, that this assertion is false. The decedent had received a significant amount of opioids in a very short period of time without any indication of need in the medical record. Based on the record he received 210 tablets of hydrocodone and 50 tablets of oxycodone. Without any indication of concern from the pharmacists, no flag in the system of concern, and no call noted to the prescriber for clarification. It was further noted in the psychiatry note, after a 2012 admission, that the decedent's opioid use disorder started with pills and progressed to heroin right after his surgery. This instigating event disproportionally impacted his limbic system, created by over 300 morphine milligram equivalents he received in less than 2 months. This was identifiable and knowable by the pharmacy, but wasn't acted upon. Again, the assertion that the high-density prescribing event that occurred through Walgreens was not responsible for his untimely death, is like saying the scissors left in the belly after a surgery were not responsible for the death from a punctured bowel that occurs 8 years after surgery. If not for the initial significant exposure, the decedent would have had the potential to live up to his Division 1 Scholarship potential, rather than drop out of school, and proceed to a heroin use disorder.

(Waller's Aff. at ¶ 10.)

"Summary judgment is proper when ' "the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." ' " *DN Reynoldsburg, LLC v. Maurices Inc.*, 10th Dist. No. 20AP-57, 2022-Ohio-949, ¶ 16, quoting *2454 Cleveland, LLC v. TWA, LLC*, 10th Dist. No. 19AP-157, 2020-Ohio-362, ¶ 8, quoting *Capella III, LLC v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, ¶ 6; *see also Transtar Elec. v. A.E.M. Elec. Servs. Corp.*, 140 Ohio St.3d 193, 2014-Ohio-3095, ¶ 8. When considering a motion for summary judgment, a court must resolve all questions and construe the evidence in favor of the nonmoving party. *Maxwell v. Lombardi*, 10th Dist. No. 21AP-556, 2022-Ohio-1686, ¶ 16, citing *2454 Cleveland, LLC* at ¶ 8, citing *Pilz v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 8.

{¶ 14} As set forth in Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the grounds for the motion and identifying those parts of the record that establish the absence of a material fact. *Maxwell* at ¶ 16, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). However, the moving party cannot meet this initial burden with a conclusory declaration that the nonmoving party has no evidence to support its case; the moving party must identify specific evidence, as listed in Civ.R. 56(C), affirmatively demonstrating that the nonmoving party has no evidence to support its claims. *DN Reynoldsburg, LLC* at ¶ 17, citing *Dresher* at 293.

{¶ 15} Once the moving party satisfies this initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or other evidence as otherwise identified in Civ.R. 56, with particular facts demonstrating that a genuine issue exists in the case. *Dresher* at 293; *Grange Mut. Ins. Co.* at ¶ 24; Civ.R. 56(E). When the evidence offered supports contradictory inferences, the court reviewing a summary judgment motion may not weigh the evidence. *DN Reynoldsburg, LLC* at ¶ 17, citing *Thyssen Krupp Elevator Corp. v. Constr. Plus, Inc.*, 10th Dist. No. 09AP-788, 2010-Ohio-1649, ¶ 20.

{¶ 16} This court considers a trial court's grant of a motion for summary judgment under a de novo standard of review. *Maxwell* at ¶ 17, citing *DN Reynoldsburg, LLC* at ¶ 16,

citing *Capella III, LLC* at ¶ 16, citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547 548 (2001). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Maxwell* at ¶ 17.

## IV. LEGAL ANALYSIS

### A. The Estate's Assignment of Error

{¶ 17} In its sole assignment of error, the Estate argues that the trial court erred by granting appellees' motion for summary judgment. Specifically, the Estate contends that the trial court erroneously disregarded the Estate's expert opinion that established there was at least a dispute of material fact as to the proximate cause of the decedent's death.

{¶ 18} R.C. 2125.01(A)(1) sets forth a cause of action for wrongful death. To succeed in a wrongful death claim that is based under a theory of negligence, a plaintiff must demonstrate, " '(1) the existence of a duty owing to plaintiff's decedent, *i.e.*, the duty to exercise ordinary care, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death.' " (Emphasis sic.) *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 10th Dist. No. 14AP-441, 2015-Ohio-3841, ¶ 35, quoting *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966), paragraph one of the syllabus.

{¶ 19} Generally, the element of causation is an issue for the trier of fact. *Reiger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, ¶ 11, citing *Renfroe v. Ashley*, 167 Ohio St. 472, 475 (1958). Summary judgment on proximate cause should be reserved for cases where the evidence is " ' "so meager and inconclusive that a finding of proximate cause would rest on speculation and conjecture[.]" ' " (Bracketing sic.) *Perez v. Crown Equip. Corp.*, 3d Dist. No. 1-22-26, 2022-Ohio-4761, ¶ 31, quoting *Bailey v. Ward*, 3d Dist. No. 8-16-03, 2016-Ohio-7173, ¶ 45, quoting *Schutt v. Rudolph-Libbe Inc.*, 6th Dist. No. WD-94-064, 1995 Ohio App. LEXIS 1211, *18 (Mar. 31, 1995), citing *Renfroe* at syllabus. However, the plaintiff must present some evidence of causation before the question can be submitted to the jury. *Id.* The act is the proximate cause of the injury if the injury is the " 'natural and probable consequence of the alleged negligent act.' " *Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 54, quoting *Taylor v. Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-1156, 2012-Ohio-4792, ¶ 22, citing *Sutowski v. Eli Lilly & Co.*, 82 Ohio St.3d 347, 351 (1998). " 'To find that an injury was the natural and probable cause of an alleged

negligent act, it must appear that the injury complained of could have been foreseen or reasonably anticipated from the act.'" *Miller* at ¶ 54, quoting *Taylor* at ¶ 22, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981).

{¶ 20} Civ.R. 56(C) provides a comprehensive list of evidentiary materials that the trial court may consider when ruling on a motion for summary judgment. *Buroker v. Pratt Indus*. 10th Dist. No. 19AP-383, 2020-Ohio-2845, ¶ 34. Pursuant to Civ.R. 56(E), an affidavit must be made based on personal knowledge and "set forth such facts as would be admissible in evidence." Further, the affidavit must "show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." *Id*. To comply with Civ.R. 56(E) as well as Evid.R. 702 and 705, an expert's affidavit must set forth the expert's credentials and facts that support their opinion. *Buroker* at ¶ 35, citing *Beattie v. McCoy*, 1st Dist. No. C-170197, 2018-Ohio-2535, ¶ 26. The expert affidavit may not provide conclusory statements without supporting facts. *Buroker* at ¶ 35, citing *Beattie* at ¶ 26.

{¶ 21} The Supreme Court of Ohio has found that courts should favor the admissibility of expert testimony if it is relevant and the criteria of Evid.R. 702 is satisfied. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 23. Evid.R. 702 requires: (A) that the witness' testimony relates to the matter beyond the knowledge or experience possessed by lay persons; (B) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education as to the subject matter of the testimony; and (C) the witness' testimony is founded on reliable scientific, technical or other specialized information. Evid.R. 702. Evid.R. 703 through 705 address the limitations of an expert's testimony. *See* Evid.R. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing"); Evid.R. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact"); Evid.R. 705 ("The expert may testify in terms of opinion or inference and give the expert's reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.").

{¶ 22} The parties have presented competing arguments as to causation. Appellees contend that the decedent's injuries, and subsequent death, were not the result of the prescriptions dispensed by Walgreens as the decedent used opioids after Walgreens

dispensed its last prescription on November 28, 2009. Appellees also argue that the decedent's history of addiction treatment and a period of sobriety in 2015 disrupted the causal chain in this case. Finally, appellees argue that the decedent died from mixed drug toxicity of acetyl, fentanyl, and oxycodone, not from any of the prescriptions filled in the fall of 2009. Conversely, the Estate offered Dr. Waller's expert affidavit to rebut Walgreens' proximate cause arguments. The question becomes, construing the evidence in favor of the Estate, whether the affidavit of the Estate's expert, Dr. Waller, provides a sufficient basis to demonstrate that there is a reasonable dispute of material fact as to the element of causation.

{¶ 23} As Dr. Waller's affidavit attests, he is an addiction, pain, and emergency medicine specialist. Dr. Waller is board certified in emergency medicine and addiction medicine and holds a Master of Science in Biology with a neuro-molecular focus. Dr. Waller is the Editor in Chief for the American Society of Addiction Medicine criteria, and he has authored a chapter in the *American Society of Addiction Medicine's Handbook on Pain and Addiction* titled, "The Neuroscience of Pain and Addiction." Dr. Waller has also served in various capacities within the American Society of Addiction Medicine, including as chair of the Legislative Advocacy Committee. In that role, Dr. Waller has testified before the United States Congress regarding opioid addiction and treatment.

{¶ 24} According to Dr. Waller, the "defining aspect[]" of Opioid Use Disorder is "behavior and not the current presence or absence of a drug." (Waller's Aff. at ¶ 6.) "[E]xposure to opioids, including Defendants' Drugs, leads to addiction and the resultant behavioral impact of addiction is that the drugs cause fundamental changes to the brain." *Id.* at ¶ 7. These changes to the brain are progressive, and once developed, are persistent even years after the drug use discontinuation. "[This] is what makes addiction a long-term chronic, and relapsing disease." *Id.* Dr. Waller explained that addiction, "[l]ike other chronic diseases," works in "cycles of relapse and remission" and a period of sobriety would not have changed the underlying event. *Id.* at ¶ 5.

{¶ 25} Regarding the case at hand, Dr. Waller attested that he reviewed the decedent's medical records and prescription history and found, "based upon reasonable degree of medical certainty," that Walgreens dispensing 260 opioids to the decedent in less than two months created an "instigating event" that "disproportionately impacted his

limbic system," which was "created by the over 300 morphine milligram equivalents he received in less than 2 months." *Id.* at ¶ 10. Dr. Waller concluded that there was a causal connection between the prescribed opioids in 2009, the decedent's diagnosis of opioid use disorder, and untimely death in 2017. *Id.* Dr. Waller wrote "[i]f not for the significant initial exposure," the decedent would have lived up to his "Division 1 Scholarship potential" and not have become addicted to opioids. *Id.* at ¶ 10. "[T]he assertion that the high-density prescribing event that occurred through Walgreens was not responsible for the untimely death, is like saying the scissors left in the belly after a surgery were not responsible for the death from a punctured bowel that occurs 8 years after surgery." *Id.* at ¶ 10. Dr. Waller noted that the decedent was an adolescent at the time of the initial exposure making him "particularly vulnerable." *Id.* at ¶ 9. Accordingly, construing the evidence in favor of the Estate, Dr. Waller's expert affidavit rebuts appellees' arguments and provides sufficient evidence that reasonable minds could find that the prescriptions were the proximate cause of death to the decedent.

{¶ 26} Appellees cite three portions in Dr. Waller's affidavit, which they contend are speculative and conclusory. The first point of contention is Dr. Waller's statement that the decedent "received a significant amount of opioids in a very short period of time without any indication of need in the medical record." (Waller's Aff. at ¶ 10). Appellees contend this point is speculative as the record shows that there was a need based on the father of the decedent requesting a refill of oxycodone, the decedent's mother testifying that the decedent underwent "major surgery," and that Dr. Westerheide testified that shoulder surgery can be very painful. While the record shows that there was a general need for pain relief after surgery, there is a reasonable dispute of fact whether opioids were necessary to manage the pain, and even if opioids were suitable in this case, whether the amount of opioids dispensed during this period was appropriate.

{¶ 27} The next point of dispute is Dr. Waller's statement that Walgreens dispensed 260 opioids to the decedent "[w]ithout any indication of concern from pharmacists" or "flag in the system of concern." (Waller's Aff. at ¶ 10). Appellees contend that the claim that Walgreens lacked concern was not supported by the record. Appellees cites Walgreens' policy that there should have been a flag in the system for the November 18, 2009 duplicate prescription. Walgreens also contends that the change of the prescription from a Schedule

II to a Schedule III prescription on October 5, 2009, and Walgreens' policy of flagging a duplicate prescription indicated concern for the decedent.

{¶ 28} However, in deciding a motion for summary judgment, a court must construe evidence in favor of the nonmoving party. *See Sommai Ruksujjar v. Wilgus*, 10th Dist. No. 09AP-93, 2009-Ohio-5025, ¶ 9. Through this lens, we cannot outright dismiss Dr. Waller's claim that Walgreens had no indication of concern. There is nothing in the record to confirm why Walgreens changed the October 5, 2009 prescription from a Schedule II to a Schedule III substance. While Wagner believed the change was a reflection of Walgreens' concern for the decedent as it was a new therapy, *see* Wagner's Dep. at 98-99, it could also have been, as Dr. Westerheide posited, that the prescribed medication was not available at that time. (Westerheide's Dep. at 20.) Moreover, there was no testimony provided that demonstrated Walgreens' policy of flagging a duplicate prescription occurred even if it was designed to do so. Those records were purged consistent with Walgreens' record retention policy. This type of weighing of the evidence is reserved for the jury and is not appropriate for summary judgment. At this stage, we must resolve doubts and construe evidence in favor of the nonmoving party. *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 269 (1993).

{¶ 29} The final point of contention involves Dr. Waller's statement that there was "no call noted to the prescriber for clarification" on the prescriptions. (Waller's Aff. at ¶ 10). Upon review, there is no evidence in the record that demonstrates any calls were made to the prescribers after the October 5, 2009 prescription. Appellees claim that pharmacists could have called but either failed to document it on the prescription or in the Intercom Plus system, which was later purged consistent with Walgreens' retention policy. Again, at this stage, the record could infer both that someone did call or that no one called. However, credibility determinations are reserved for the trier of fact. *Turner v. Turner*, 67 Ohio St.3d 337 (1993), paragraph one of the syllabus. Generally, the weight to give an inference is an issue of fact. *See Sommai Ruksujjar* at ¶ 12. An inference will be disregarded as speculative only when reasonable minds cannot help but conclude that the inference is not supported by the greater weight of the evidence, even when evidence is construed most strongly in favor of the nonmoving party. *Id.* Even if the issue of proximate cause relied upon indirect, rather than direct, evidence of causation, it can still be enough to create a genuine issue of

material fact. *Id.* at ¶ 13. Additionally, a nonmoving party need not effectively eliminate all other possible causes to meet their summary judgment burden. *Id.* at ¶ 16, citing *Westinghouse Elec. Corp. v. Dolly Madison Leasing & Furniture Corp.*, 42 Ohio St.2d 122, 127 (1975). At the very least, there is a dispute of fact that no calls were made by the physicians after the October 5, 2009 prescription. Appellees argue that summary judgment should also be granted based on Dr. Waller's lack of discussion on the breach of a duty element. We note that appellees failed to present the argument in their initial motion for summary judgment. Generally, arguments raised for the first time on appeal that could have been raised are waived or forfeited on appeal. *G & I IX 6840 Pontius LLC v. Franklin Cty.*, 10th Dist. No. 19AP-661, 2020-Ohio-4660, ¶ 17. As the trial court never addressed the issue of breach in its decision, we decline to examine the issue for the first time.

{¶ 30} Appellees have argued in the alternative that Walgreens did not have a duty in this case under the learned intermediary doctrine. "Under the facts of this case, the learned intermediary doctrine stands for the proposition that pharmacists in Ohio do not have a generalized, affirmative duty or legal obligation to warn patients of potential adverse reactions, side effects, or dangers of prescription drugs for every prescription they fill absent some special circumstances." (Emphasis deleted.) (Appellees' Brief at 27.) However, the trial court declined to address this argument in its decision. Generally, appellate courts will not address an argument that was not first considered by the trial court. *Roush v. Butera*, 8th Dist. No. 97463, 2012-Ohio-2506, ¶ 27. As such, upon remand the trial court is instructed to consider the remaining arguments, including the learned intermediary doctrine, asserted in appellees' motion for summary judgment.

{¶ 31} It is easy to see how the trial court misconstrued the facts regarding causation in this case. To be sure, the period between the dispensing of the drugs to the decedent's overdose is significant. However, addiction is a "long-term, chronic, and relapsing disease" that is complex to evaluate in this context. (Waller's Aff. at ¶ 7.) Here, the goal of summary judgment is not to try issues of fact but to assess whether issues of fact exist. *Thompson v. Eroglu*, 7th Dist. No. 05 MA 40, 2006-Ohio-7060, ¶ 10. Dr. Waller's affidavit provides the requisite basis for this matter to return to the trial court for further review. Whether the Estate is ultimately meritorious in its claims is not for this court to decide at this stage in the case.

{¶ 32} The Estate's sole assignment of error is sustained.

## V.  CONCLUSION

{¶ 33} Having sustained the Estate's sole assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas.  The case is remanded to the trial court to consider the other grounds in appellees' motion for summary judgment and, if necessary, further proceedings consistent with this decision.

*Judgment reversed*;
*cause remanded with instructions.*

BEATTY BLUNT, P.J., and JAMISON, J., concur.

_____