[Cite as *Wilkes v. Ohio Dept. of Transp.*, 2024-Ohio-558.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| PATRICIA D. WILKES, Indv. | Case No. 2019-00012JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | <u>DECISION</u> |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

{¶1} Plaintiff Patricia D. Wilkes, as Personal Representative of the Estate of Marquise Shawndell Byrd, brings a wrongful death action against Defendant Ohio Department of Transportation. After a trial on the merits, the Court holds that Plaintiff has not established her claims by a preponderance of the evidence and that judgment should be entered in favor of Defendant for reasons that follow.

## I.  Background and Procedural History

{¶2} Plaintiff's case stems from the death of Plaintiff's son, Marquise Shawndell Byrd, a resident of Michigan, who at the time of his death was 22 years old. On December 19, 2017, Byrd was a passenger sitting in the front seat of a vehicle that was being driven southbound on Interstate 75 at nighttime in Toledo, Ohio. Late at night when the vehicle approached the Indiana Avenue Overpass—a structure that had been under reconstruction for approximately four months by Kokosing Inc. (a contractor hired by the Ohio Department of Transportation (ODOT))—a sandbag that weighed between 30-50 pounds was dropped from the overpass.[1] The sandbag was consistent with the type of sandbag used to secure signage during the project. At the time of the incident, existing vandal fencing was in place on the south side of the bridge but, on the north side of the

---

[1] In a federal district court Plaintiff sued Kokosing Inc. on a claim of negligence. The federal district court granted summary judgment in favor of Kokosing, Inc., and a federal court of appeals affirmed. *Wilkes v. Kokosing, Inc.*, 6th Cir. No. 21-3859, 2022 U.S. App. LEXIS 12707 (May 9, 2022).

bridge, vandal fencing had been removed during construction as the portion of the bridge that supported the vandal fencing on the north side had been removed. At the time of the incident, the north side of the bridge was closed for pedestrian traffic, but the sidewalk on the south side of the bridge remained open for pedestrians and the roadway remained open for one-way vehicular traffic.

{¶3} The sandbag that was dropped from the bridge crashed through the vehicle's windshield, causing Byrd to sustain severe injuries. Byrd succumbed to his injuries at a nearby hospital. Four juveniles were later prosecuted for their actions associated with the dropping of the sandbag from the overpass.

{¶4} The Court denied Defendant's motion for a summary judgment and the case proceeded to a bench trial on issues of liability and damages. After Plaintiff presented her case-in-chief, Defendant moved for a dismissal under Civ.R. 41(B)(2) on the ground that, upon the facts and the law, Plaintiff had shown no right to relief. The Court denied Defendant's Civ.R. 41(B)(2) motion. Defendant rested its case without calling any witnesses in its defense. The Court heard closing arguments and took the matter under advisement.

## II.     Summary of the Parties' Arguments

{¶5} Plaintiff notes that, before the Indiana Avenue Overpass underwent reconstruction, both sides of the Overpass had vandal fencing. Plaintiff maintains that Defendant acted negligently (and therefore Defendant should be held liable) when it failed to instruct Kokosing Inc. to erect temporary vandal fencing (or other protective fencing) during the reconstruction of the Indiana Avenue Overpass—notwithstanding that, at the time of the incident at issue, ODOT had no policy governing the use of temporary vandal fencing when a bridge was being rehabilitated or reconstructed. Plaintiff's Complaint alleges that the dropping of objects from the overpass was foreseeable, thus requiring ODOT to install vandal fencing during reconstruction of the Indiana Avenue Overpass. At trial Plaintiff focused on ODOT's Bridge Design Manual (BDM), which required fencing in certain circumstances, as well as possible measures (e.g., additional lighting at the construction site, temporary protective fencing, and using a special duty police officer to guard the overpass) that ODOT could have taken to decrease Marquise Shawndell Byrd's

risk of exposure to harm.  Plaintiff maintains that Defendant's claim that ODOT lacked a policy governing the use of temporary vandal fencing during the reconstruction of a bridge conflicts with a statement in Section 305.2 of the BDM, which states, in part: "*Fencing shall be installed on all bridges over vehicular traffic* except as noted herein."  (Emphasis added.)  (BDM Section 300 Detail Design, July 2016, 3-78.)

{¶6} Defendant contends that the BDM governs the design of new bridges and that the BDM is inapplicable to a bridge under reconstruction.  Defendant asserts that, at the time of Byrd's death, ODOT had no policy requiring temporary vandal fencing for bridges under reconstruction, such as the Indiana Avenue Overpass.  Defendant also contends that it is entitled to discretionary immunity for its lack of a policy for temporary protective fencing during a bridge's reconstruction, and, consequently, it is entitled to a judgment in its favor.  Defendant notes that, despite a recommendation from Kokosing Inc. to close the Indiana Avenue Overpass during demolition and reconstruction, officials from the city of Toledo asked to have the overpass remain open for vehicles and pedestrians during the construction project because the overpass connected certain parts of the city to downtown Toledo.  Defendant further notes that, affixed to a barrier, was a sign with an arrow stating "Sidewalk Closed Use Other Side," which informed the public that a side of the bridge was closed.  Defendant also notes that there was a three-and-a-half-foot concrete barrier between the roadway and the north side of the bridge.[2]  Defendant argues that, if it is not entitled to a judgment in its favor based on discretionary immunity, then it nevertheless should prevail in this case because it is not proximately liable for Byrd's death due to the superseding and intervening criminal activity of third parties.

### III.  Law and Analysis

### A. ODOT's Bridge Design Manual does not expressly apply to a bridge undergoing reconstruction based on evidence presented at trial.

{¶7} Section 101 (Introduction) of ODOT's Bridge Design Manual (BDM) establishes the scope of the BDM.  It provides:

---

[2] At trial no expert testimony (or other evidence) was presented regarding what type of additional precautions should have been taken.

> This manual shall be utilized for the design and rating of new non-buried bridges; the rating of new buried bridges; and the design of new retaining walls and noise walls.
>
> The ODOT Bridge Design Manual, January 2004 shall be utilized for the analysis and rating of existing non-buried bridges; the rating of existing buried bridges; the analysis of existing retaining walls and noise walls; and the design of rehabilitations for existing non-buried bridges, retaining walls and noise walls.
>
> The ODOT Location & Design Manual, Volume 2 shall be utilized for the design of structure types consisting of Type A and Type B conduit as defined in the CMS Item 603.
>
> The ODOT Traffic Engineering Manual shall be utilized for the design of sign supports.

(BDM, 1-1.) Thus, according to Section 101, the scope of the Bridge Design Manual should not be understood to expressly set forth requirements for a bridge during the reconstruction of a bridge. It is true that Section 305.2 of the BDM states, in part: "Fencing shall be installed on all bridges over vehicular traffic except as noted herein." (BDM Section 300 Detail Design, July 2016, 3-78.) However, when this statement in Section 305.2 is considered in conjunction with Section 101, the Court concludes that the BDM did not apply to the Indiana Avenue Overpass during the process of its reconstruction at the time of the incident involving Marquise Shawndell Byrd.

### B. ODOT is not entitled to discretionary immunity under the facts presented at trial.

{¶8} Discretionary immunity is a judicially created doctrine. *See Reynolds v. State, Div. of Parole & Community Servs.*, 14 Ohio St.3d 68, 471 N.E.2d 776 (1984). In *Reynolds* the Ohio Supreme Court held:

> The language in R.C. 2743.02 that "the state" shall "have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *" means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning

function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities.

*Reynolds* at paragraph one of the syllabus. *See Risner v. Ohio Dept. of Transp.*, 145 Ohio St.3d 55, 2015-Ohio-4443, 46 N.E.3d 687, ¶ 12 (discussing "discretionary-function doctrine").[3]

{¶9} In *Risner*, *supra*, at ¶ 24, the Ohio Supreme Court emphasized that, although ODOT has immunity for certain decisions themselves, ODOT "is not immune from liability for damages resulting from negligence that occurs in implementing those decisions." *Id.* The Ohio Supreme Court explained: "[W]hile ODOT is immune from any liability arising from the decisions made pursuant to its discretionary function, immunity does not extend beyond that discretionary function to acts of implementation. ODOT has a duty to properly implement its discretionary decisions. It may be subject to liability if it fails to abide by current construction standards or otherwise acts negligently in executing a decision to improve an existing highway." *Id.*

{¶10} For discretionary immunity to apply to Defendant's lack of a policy for the use of temporary protective fencing during the reconstruction of the Indiana Avenue Overpass, Defendant is required to have engaged in "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds* at paragraph one of the syllabus. *Accord Foster v. Ohio Dept. of Rehab. & Correction*, 10th Dist. Franklin No. 12AP-503, 2013-Ohio-912, ¶ 23 ("application of the discretionary immunity doctrine requires more than a finding that a state employee * * * made a decision that required the exercise of a high degree of discretion—it requires a finding of the exercise

---

[3] In *Risner v. Ohio Dept. of Transp*, 145 Ohio St.3d 55, 2015-Ohio-4443, 46 N.E.3d 687, ¶ 12, the Ohio Supreme Court "adopt[ed] the phrase 'discretionary-function doctrine' as shorthand to mean that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision that is characterized by the exercise of a high degree of official judgment or discretion." (Footnote omitted.)

of a high degree of official judgment or discretion as to an executive or planning function involving the making of a basic policy decision").

{¶11} In common usage, a decision means "a determination arrived at after consideration." https://www.merriam-webster.com/dictionary/decision (accessed Oct. 9, 2023). The word "consider" may be defined as "1: to think about carefully: such as a: to think of especially with regard to taking some action * * * b: to take into account * * * 2: to regard or treat in an attentive or kindly way." https://www.merriam-webster.com/dictionary/consider (accessed October 19, 2023).

{¶12} Evidence adduced at trial shows whether to install temporary vandal fencing (or other temporary protective fencing) during the reconstruction of the Indiana Avenue Overpass was not carefully considered by ODOT officials. At trial, when Mark Mondora, who was an area engineer for the Indiana Avenue Overpass Project, was asked whether a temporary measure was feasible, Mondora testified: "Well, at the time of this incident, we had no testing, as far as I knew, on putting up vandal protective fencing * * * We had no testing for wind loads, crash ratings, or anything. So we -- it would not have been an option for us at that time." When Mondora was asked whether there had been any discussion about how to "mitigate the difference" between the three-and-a-half-foot cement barrier on the north side of the bridge when the incident occurred and the former eight-foot vandal protective fence, Mondora testified: "There was no discussion."

{¶13} This evidence does not support a finding that lack of a policy for the use of temporary protective fencing during the reconstruction of the Indiana Avenue Overpass was the result of considered planning regarding the use of temporary protective fencing. No evidence was presented that ODOT made a considered decision to not have a policy regarding temporary protective fencing on bridges under construction. Mondora testified that he had "no concerns" that the fencing on the north side of the bridge had been removed, so he did not instruct ODOT's contractors "to do anything above and beyond what was in the contract." Mondora further testified: "I did not instruct them to do anything, as I didn't think that there was a concern on the north side." When Mondora was asked whether there was a reason why no other fencing had been installed, Mondora testified, "There would be no need for any other type of fencing at that time. We only put up fencing where there was pedestrian traffic, and there was none on the north side."

{¶14} In the face of this evidence, ODOT's lack of a policy was not the result of an executive or planning function that involved the making of a basic policy decision that is characterized by the exercise of a high degree of official judgment or discretion. The Court determines that Defendant is not entitled to discretionary immunity for its lack of a policy concerning the use of temporary fencing on the north side of the Indiana Avene Overpass during its reconstruction.

**C. Plaintiff has failed to prove her claim of wrongful death based on negligence because Plaintiff has failed to prove all the elements of negligence.**

{¶15} Under Ohio law Plaintiff is required to prove her civil claims by a preponderance of the evidence. *See Merrick v. Ditzler*, 91 Ohio St. 256, 260, 110 N.E. 493 (1915) ("[i]n the ordinary civil case the degree of proof, or the quality of persuasion as some text-writers characterize it, is a mere preponderance of the evidence"); *Weishaar v. Strimbu*, 76 Ohio App.3d 276, 282, 601 N.E.2d 587 (8th Dist.1991). A preponderance of the evidence "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54.

{¶16} The weight to be given the evidence and the credibility of the witnesses is primarily for the trier of the facts to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The Court, as the trier of fact, therefore must give appropriate weight to the evidence presented, as it reviews and evaluates the evidence. The Court is free to believe all, part, or none of the testimony of any witnesses. *See State v. Green*, 10th Dist. Franklin No. 03AP-813, 2004-Ohio-3697, ¶ 24.

{¶17} Plaintiff has brought, and litigated, a wrongful death action premised on negligence. To establish a wrongful death cause of action based on a theory of negligence, a plaintiff "must show: "(1) the existence of a duty owing to plaintiff's decedent, i.e., the duty to exercise ordinary care, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death." (Citation omitted.)" *Meola v. Ohio State Univ.*, 10th Dist. Franklin No. 23AP-180, 2023-Ohio-3805, ¶ 11, quoting *Estate of Mehrer v. Walgreens Specialty Pharmacy*, 10th Dist. No. 22AP-286,

2023-Ohio-2070, ¶ 18.[4]  "Failure to demonstrate any one element is fatal to a plaintiff's cause of action for negligence."  *Meola* at ¶ 11, citing *Thomas v. LSREF3 Bravo (Ohio) LLC*, 10th Dist. No. 21AP-691, 2022-Ohio-4476, ¶ 15, citing *Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, ¶ 10.

**{¶18}** As set forth below, the Court's review of the evidence in this case leads the Court to conclude that Plaintiff has not established the elements necessary to prevail on her wrongful death action premised on negligence.  The evidence reveals that Defendant owed no special duty toward Marquise Shawndell Byrd and, furthermore, negligence on Defendant's part, if any, was not the proximate cause of Byrd's death.  Rather, the criminal activity of third parties was the proximate cause of Byrd's death.

**{¶19}** The Ohio Supreme Court has remarked that "there is no common-law duty to anticipate or foresee criminal activity."  *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 45 Ohio St.3d 171, 174, 543 N.E.2d 769 (1989).  As stated in *Federal Steel & Wire Corporation*, "the law usually does not require the prudent person to expect the criminal activity of others.  As a result, the duty to protect against injury caused by third parties, which may be imposed where a special relationship exists, is expressed as an exception to the general rule of no liability."  *Id.*  *Accord A.M. v. Miami Univ.*, 2017-Ohio-8586, 88 N.E.3d 1013, ¶ 34 (10th Dist.) [5]

---

[4] In *Constantine v. Four Seasons Racquet Club*, 8th Dist. Cuyahoga No. 39147, 1979 Ohio App. LEXIS 11901, at *3 (Aug. 9, 1979), quoting W. Prosser, The Law of Torts, Section 30 (4th Ed. 1971), the Eighth District Court of Appeals discussed the elements of the tort of negligence as follows:

> One authority has stated the elements for the tort of negligence in the following fashion:
>
> 1. *A duty,* or obligation, recognized by the law, requiring the actor *to conform to a certain standard of conduct,* for the protection of others against unreasonable risks.
>
> 2. *A failure on his part to conform to the standard required.* * * *
>
> 3. A reasonable close causal connection between the conduct and the resulting injury. This is what is commonly known as "legal cause," or "proximate cause."
>
> 4. Actual loss or damage resulting to the interests of another. * * *
>
> (Emphasis added) (Footnotes omitted).

[5] In *A.M. v. Miami Univ.*, 2017-Ohio-8586, 88 N.E.3d 1013, ¶ 34 (10th Dist.), the Tenth District Court of Appeals stated:

{¶20} But in *Federal Steel & Wire Corporation*, *supra*, at syllabus, the Ohio Supreme Court nonetheless held: "If a person exercises control over real or personal property and such person is aware that the property is subject to repeated third-party vandalism, causing injury to or affecting parties off the controller's premises, then a special duty may arise, to those parties whose injuries are reasonably foreseeable, to take adequate measures under the circumstances to prevent future vandalism."

{¶21} In *Federal Steel & Wire Corporation,* the Ohio Supreme Court noted:

> From the very beginning of the project, Ruhlin was aware of severe theft and vandalism problems common to the area. Specifically, both the job superintendent, James Knapp, and project manager for the job site, Ronald Kurtz, testified that the extraordinary crime problems were obvious and known to Ruhlin at least after the first month on the job. The severity of the vandalism and theft problems was partially attributed to the inner-city location of the project, coupled with the fact that the work site was a bridge.
>
> Specific instances of vandalism and theft were noted by Ruhlin's employees during the course of the project. Of particular importance was the fact that prior to the acts which caused Federal's damages, separate instances of vandals throwing "rebar" and other construction materials off the bridge had been reported to Ruhlin. Other instances of vandalism and

---

Ordinarily, under Ohio law, there is no duty to prevent a third person from causing harm to another absent a special relationship between the parties or a duty imposed by statute. *Slagle v. White Castle Sys., Inc.*, 79 Ohio App.3d 210, 216, 607 N.E.2d 45 (10th Dist.1992) (explaining that, typically, a person has no duty to act affirmatively for the protection of others); *Desir v. Mallett*, 10th Dist. No. 14AP-766, 2015-Ohio-2124, ¶ 22; *Wheeler v. Ohio State Univ.*, 10th Dist. No. 11AP-289, 2011-Ohio-6295, ¶ 17. If a special relationship exists by statute or common law, then a party may be subjected to liability for harm caused to another only if the criminal act of the third party was foreseeable. *Simpson v. Big Bear Stores Co.*, 73 Ohio St. 3d 130, 134, 1995 Ohio 203, 652 N.E.2d 702 (1995) ("[f]oreseeability alone is insufficient to create liability"); *Wagner v. Ohio State Univ. Med. Ctr.*, 188 Ohio App. 3d 65, 2010-Ohio-2561, ¶ 24, 934 N.E.2d 394 (10thDist.) ("Even if an injury is foreseeable, there may not be a duty to act."); *Slagle* at 216 ("[t]he mere fact that harm to another is a foreseeable consequence of one's failure to act does not, in and of itself, impose a duty to [act affirmatively for the protection of others]"). "Furthermore, '[b]ecause criminal acts are largely unpredictable, the totality of the circumstances must be "somewhat overwhelming" in order to create a duty.'" *Wheeler* at ¶ 17, quoting *Shivers v. Univ. of Cincinnati*, 10th Dist. No. 06AP-209, 2006-Ohio-5518, ¶ 7, quoting *Reitz v. May Co. Dep't Stores*, 66 Ohio App. 3d 188, 193-94, 583 N.E.2d 1071 (8th Dist. 1990).

theft were stolen cables, batteries and doors, and broken glass windows, paint poured into gas tanks, and punctured tires.

*Fed. Steel & Wire Corp* at 171-172.  The Ohio Supreme Court further noted:

Aware of these problems, Ruhlin took certain security measures by posting security guards on the bridge.  The guards were on the job site after Ruhlin's workers left for the day and remained on the site until they returned the next morning. Knapp testified that when the security personnel were posted there was a notable decrease in vandalism and theft on the job site.

In November 1982, Ruhlin ceased work on the project for the winter. The project was shut down and work was to resume in the spring of 1983, weather permitting.  While the project was dormant for the winter, Ruhlin left building materials on the bridge, which included significant quantities of "rebar," "high chairs" or steel chairs and concrete.  However, for security reasons and other considerations, Ruhlin did remove its heavy equipment from the bridge and vandalism-prone areas to the grounds of Cleveland Builders Supply.  Also, Ruhlin did not post any security guards on the bridge during the winter months when the project was dormant, specifically during the time when the alleged vandalism against Federal took place.  Moreover, Ruhlin did not reinstall the barbed wire fences on the west end of the bridge during this period.  Instead, steel beams were positioned horizontally, thirty inches off the ground to block cars and trucks, and a simple snow fence was erected.

In mid-December 1982, over one thousand windows were broken on Federal's premises when quantities of construction materials were thrown from the bridge onto Federal's property below.  As a consequence of the vandalism, Federal's property allegedly suffered damage and loss of use. The building materials used to damage Federal's property were determined to be concrete, "rebar," and "high chairs."

*Fed. Steel & Wire Corp.* at 172.

{¶22} The facts underlying *Federal Steel & Wire Corporation* are dissimilar from the facts in this case because, in *Federal Steel & Wire Corporation*, the contractor, Ruhlin

Construction Company, was aware of repeated vandalism and theft that involved the throwing of construction materials off the bridge, which is not the case here based on the evidence presented at trial.  Nor is there any evidence of "extraordinary crime problems," *see Federal Steel & Wire Corp.* at 172, or evidence that, before this incident, there were "separate instances of vandals throwing * * * construction materials off the bridge."  *See id.*

{¶23} Rather, the facts of this case align with *Feichtner v. Ohio Dept. of Transp*, 114 Ohio App.3d 346, 683 N.E. 2d 112 (10th Dist. 1995).  In *Feichtner* the Tenth District Court of Appeals affirmed this Court's judgment in favor of the Ohio Department of Transportation after a person threw a fourteen-pound sandstone rock from an overpass upon a vehicle, which, in turn, crashed through the passenger-side windshield, striking the plaintiff's wife who later succumbed to her injuries.  The Tenth District Court of Appeals stated in *Feichtner* that "the foreseeability of criminal acts depends upon the knowledge of the defendant, which must be determined from the totality of the circumstances; only when the totality of the circumstances are 'somewhat overwhelming' will a defendant be held liable for the criminal actions of a third party.  *Feichtner* at 358, quoting *Feichtner v. Cleveland*, 95 Ohio App. 3d 388, 396, 642 N.E.2d 657 (8th Dist. 1994).  The Tenth District Court of Appeals determined that "no such overwhelming circumstances" existed in *Feichtner*.  *Feichtner* at 358.  The Tenth District Court of Appeals noted that two engineers of ODOT—Gary David Leake and Eric Forsberg— "testified that, although [ODOT] may have been apprised of scattered complaints of items being thrown from bridges onto highways in the state of Ohio, there were no complaints of objects ever being thrown from the Fleet Avenue bridge, either prior to or during the construction project. Furthermore, Leake stated that he was unaware of any documented complaints of increased rock throwing in construction areas where the lanes of traffic had been temporarily shifted."  *Id.* at 358.  The Tenth District Court of Appeals' review of the evidence in *Feichtner* led the court of appeals to conclude that the plaintiff did not establish the elements necessary to maintain his negligence action.  The *Feichtner* court thus held that ODOT owed no special duty to the plaintiff's wife to anticipate or foresee the criminal actions of the wrongdoer.  *Feichtner* at 359.

{¶24} Here, similar to *Feichtner*, the evidence in this case demonstrates that there were no prior incidents of objects having been thrown from the Indiana Avenue Overpass before this tragic event.  And similar to *Feichtner*, whether ODOT may have had knowledge of items having been thrown from bridges onto highways in the state of Ohio in the past, there were no complaints of objects ever being thrown from the Indiana Avenue Overpass, either before or during the construction project.[6]

{¶25} Drawing from *Feichtner*, the Court therefore finds that Plaintiff has not established by a preponderance of the evidence that the reconstruction of the Indiana Avenue Overpass was subjected to repeated third-party vandalism, which may have required Defendant to take adequate measures to prevent future vandalism and, which, in turn, may have occasioned a special duty to arise between Defendant and Plaintiff's decedent.  *See Federal Steel & Wire Corporation*, *supra*, at syllabus.  The Court further finds that Plaintiff failed to present evidence from which the Court could conclude that an exception to the general rule of no liability for criminal actions of third parties had been established, *see Federal Steel & Wire Corporation* at 174, or that the totality of the circumstances was "somewhat overwhelming" in order to hold Defendant liable for the criminal actions of third parties.  *See Feichtner*, 114 Ohio App.3d at 358, 683 N.E.2d 112 (10th Dist.1995).

## III.    Conclusion

{¶26} Upon careful consideration of all the evidence and the arguments of counsel, the Court holds that Plaintiff has failed to prove every element of negligence in this wrongful death action.  Accordingly, Defendant is entitled to a judgment in its favor.

LISA L. SADLER
Judge

---

[6] There was no evidence that there were any complaints, let alone repeated complaints, of objects being thrown from the bridge either before the reconstruction of the bridge or during the four months of the reconstruction work on the bridge after the fencing had been removed.

| | |
|---|---|
| PATRICIA D. WILKES, Indv. | Case No. 2019-00012JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

**IN THE COURT OF CLAIMS OF OHIO**

{¶1} For reasons stated in the Decision filed concurrently herewith, the Court holds that Plaintiff has failed to prove every element of negligence in this wrongful death action. Judgment is entered in favor of Defendant. Court costs are assessed to Plaintiff. The Clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

 

 

LISA L. SADLER
Judge

**Filed January 12, 2024**
**Sent to S.C. Reporter 2/15/24**